[Civ. No. 53420. Second Dist., Div. Four. Dec. 14, 1979.]

MITCHEL J. EZER et al., Plaintiffs and Respondents, v.
HEINZ FUCHSLOCH et al., Defendants and Appellants.

COUNSEL

Roy L. Kight for Defendants and Appellants.

Frances L. Ezer, in pro. per., Rich & Ezer and L. Douglas Brown for Plaintiffs and Respondents.

OPINION

**JEFFERSON (Bernard), J.**—This is an appeal by defendants Heinz Fuchsloch and Christine Fuchsloch from a mandatory injunction issued against them following a trial on a complaint filed against them by

plaintiffs Mitchel J. Ezer and Frances L. Ezer. The dispute results from the fact that plaintiffs and defendants are neighbors residing in a hillside area located in Pacific Palisades. The complaint alleged that the improved property of plaintiffs was directly opposite of the defendants' improved property and property owned by the Staleys, also named as defendants in the action. The complaint further alleged that, on May 4, 1962, defendant Marquez Knolls, Inc.,[1] the owner of all of the lots in the tract of which the properties of plaintiffs, the defendants Fuchslochs and Staleys are a part, recorded a declaration of restrictions.

The restrictions provided that no tree, shrub, or other landscaping should be planted that would at present or in the future obstruct the view from any other lot. The plaintiffs alleged that the trees growing on the Fuchsloch and the Staley properties had grown to such a height that they were almost completely obstructing the view of the Pacific Ocean and the surrounding areas from plaintiffs' property. Plaintiffs sought a mandatory injunction requiring the Fuchsloch and Staley defendants to trim the trees on their respective properties so that such trees no longer obstructed the view from plaintiffs' property. The Fuchsloch defendants filed an answer which consisted of general and specific denials of the allegations contained in plaintiffs' complaint.[2]

Following trial, the court granted a mandatory injunction against the Fuchsloch and Staley defendants. With respect to the Fuchsloch defendants, the injunction ordered these defendants to cut down to the level of the roof of their house all trees and shrubs located on the property which appeared on a particular photograph which had been received into evidence as an exhibit. The injunction further ordered the Fuchsloch defendants to thereafter keep their trees and shrubs cut so that they did not grow above the rooftop of their home.

On this appeal, the Fuchsloch defendants contend that the dispute between the parties relates primarily to a specific pine tree which is approximately 25 feet in height and stands in the center of the back yard of defendants' property directly behind their house.

Basically, defendants assert four contentions in seeking a reversal of the judgment. First, defendants assert that the mandatory injunction or-

---

[1]Although named as a defendant, the record before us indicates that this corporate defendant was not served in the action.

[2]The Staley defendants defaulted and filed no answer or other pleading to plaintiffs' complaint.

der constitutes an abuse of judicial discretion as being unjust, unreasonable, arbitrary and contrary to public policy and public good. Second, defendants claim that the trial court misinterpreted the restrictive covenant document. Third, defendants assert that the trial court failed to give adequate consideration to the rights of the tree as distinct from the rights of the individual litigants. Fourth, the defendants claim that the plaintiffs are barred by the doctrines of laches and waiver.

Plaintiffs, as respondents on appeal, renew their motion to dismiss defendants' appeal.

We consider first the dismissal-of-appeal motion.

I

PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' APPEAL

During the pendency of this appeal plaintiffs filed a previous motion for a dismissal of the appeal. This motion was denied without prejudice. Plaintiffs devote a substantial portion of their brief to the proposition that the court's minute order of November 10, 1977, was an *order* granting an injunction, made appealable by Code of Civil Procedure section 904.1, subdivision (f), and that defendants' notice of appeal, filed March 3, 1978, was therefore not timely. In this court's prior order denying, without prejudice, plaintiffs' motion to dismiss defendants' appeal, it was pointed out that the minute order of November 10 was *not* a minute order granting an injunction but a notice of intended decision which would not be effective until entry of a formal judgment. (See Code Civ. Proc., § 632 and rule 232 (a), Cal. Rules of Court.) The first formal judgment or order granting an injunction was signed and filed by the trial judge and entered on January 4, 1978. It bore the label, "Mandatory Injunction." The defendants' notice of appeal, filed March 3, 1978, was therefore timely under rule 2 (a) of the California Rules of Court, with respect to the mandatory injunction of January 4, 1978.

Plaintiffs now contend that the mandatory injunction of January 4, 1978, was neither an appealable order for an injunction (Code Civ. Proc., § 904.1, subd. (f)), nor an appealable final judgment (Code Civ. Proc., § 904.1, subd. (a)) in this action because a subsequent judgment in the action was entered on June 29, 1979. It is the June 29

judgment which the plaintiffs seek to label as the only final judgment from which an appeal may be taken.

■ Plaintiffs assert that, for purposes of appeal, there is a difference between an *order* granting an injunction and the *injunction* itself. Plaintiffs thus cite cases such as *Monterey Club* v. *Superior Court* (1941) 44 Cal.App.2d 351 [112 P.2d 321] and *Meehan* v. *Hopps* (1955) 45 Cal.2d 213 [288 P.2d 267], as holding that it is the *order* granting the injunction, and *not* the writ of injunction itself, which is appealable.

An examination of the cases cited by plaintiffs indicate that such cases do not make a distinction between an order granting an injunction and a writ of injunction, a judgment *of* injunction, or an order *of* injunction for purposes of denominating the appealable order or judgment. An injunction is defined in Code of Civil Procedure section 525. This section provides: "An injunction is a writ or order requiring a person to refrain from a particular act...." In view of the language of Code of Civil Procedure section 525, it is understandable that Code of Civil Procedure section 904.1, subdivision (f), uses the language that an appeal may be taken from an *order granting* an injunction. However, an injunction as a writ or order, comes within the definition of a judgment. Code of Civil Procedure section 577 provides that "[a] judgment is the final determination of the rights of the parties in an action or proceeding." An injunction—as a writ, order or judgment—comes within the definition of "judgment" set forth in Code of Civil Procedure section 577.

■ In the case at bench it is clear that the mandatory-injunction document, which was signed by the judge and entered on January 4, constituted a final judgment which was an appealable judgment under Code of Civil Procedure section 904.1, subdivision (a). ■ The label, "Mandatory Injunction," placed on the document, has no relevancy in determining whether the document is such that it comes within the definition of a "judgment." If the document constitutes a "final determination of the rights of the parties in an action or proceeding," it constitutes a "judgment" as defined by Code of Civil Procedure section 577. The form of the final determination—whether it be an order for the recovery of money or an order compelling a party to do or refrain from doing an act—does not change the character of the document as a judgment.

 Prior to the final judgment of mandatory injunction, entered on January 4, 1978, the trial court had made no order granting an injunction. The November 10 minute order was simply an announcement of intended decision. As indicated in rule 232 (a) of the California Rules of Court, such "announcement of intended decision shall not constitute a judgment and shall not be binding on the court." It merely starts the time running on a request for findings. (Cal. Rules of Court, rule 232 (b).) A minute entry of a notice or announcement of intended decision can be considered at best as a preliminary order looking forward to a formal judgment. As a preliminary order, it is not appealable.

We recognize that, in some situations, it is appropriate for a trial court, by minute entry, to make an order granting an injunction, which would be an appealable order under Code of Civil Procedure, section 904.1, subdivision (f). Such a situation was presented in *Meehan v. Hopps, supra*, 45 Cal.2d 213. In *Meehan*, the defendant Hopps, in an action seeking an accounting, moved to disqualify plaintiffs' counsel because of his former representation of defendant. By minute order, the trial court denied the motion. The *Meehan* court held that the minute order was an order *refusing* to grant an injunction and, as such, was an appealable order[3] "[b]ecause the trial court's order denying Hopps' motion left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, . . ." (*Id.* at p. 217.)

 It is now asserted by plaintiffs that the mandatory injunction executed by the court on January 4, 1978, cannot be deemed a final judgment for purposes of appeal. Plaintiffs point out that on June 29, 1979, a document, appropriately labelled a "judgment," was signed by the trial judge and duly entered as a part of the within action. It is plaintiffs' position that the June 29 judgment must be construed as the only final judgment that has been made in the case at bench.

A certified copy of the June 29 judgment is attached to plaintiffs' brief and plaintiffs request that we take judicial notice of this June 29 judgment pursuant to the provisions of sections 452, subdivision (d), and 459 of the Evidence Code.

---

[3]The *Meehan* case dealt with the appeal provisions of Code of Civil Procedure section 963 which was the forerunner of Code of Civil Procedure section 904.1, and contained language identical with the language now found in Code of Civil Procedure section 904.1, subdivision (f).

We have taken judicial notice of the June 29 judgment. It appears from the judgment itself that it was made following a motion by plaintiffs for an order to modify the January 4 mandatory injunction, and after plaintiffs and the Staley defendants had entered into a stipulation for such modification. Our review of the judgment of June 29, 1979, which modified the January 4 judgment, indicates that it contained no provisions which affected the rights of the Fuchsloch defendants, with the exception that it purported to reserve jurisdiction to enforce in the future the mandatory injunction of January 4 as modified by an order made on August 29, 1978, modifying the injunction of January 4 pursuant to a stipulation between the plaintiffs and the Staley defendants.

We conclude, however, that the judgment of June 29, 1979, cannot be considered as converting the mandatory injunction of January 4 into a nonappealable interlocutory judgment. We thus hold that the mandatory injunction, executed by the trial judge on January 4, 1978, constitutes a final judgment that is the subject of this appeal pursuant to Code of Civil Procedure section 904.1, subdivision (a). We therefore deny plaintiffs' second motion to dismiss defendants' appeal.

## II

### WAS THERE AN ABUSE OF DISCRETION BY THE TRIAL COURT IN RENDERING AGAINST DEFENDANTS A MANDATORY INJUNCTION JUDGMENT?

■ Defendants assert that the trial court's mandatory injunction constituted an abuse of discretion because it was unreasonable to require that trees on their property be trimmed in height to the level of the roof of defendants' house. The roof-top limit was unreasonable, claim the defendants, because only one tree was involved—a tall pine tree—and that trimming it to roof-top level was not required to preserve plaintiffs' view. According to defendants, this pine tree only blocked 1 degree of a 175 degree view enjoyed by plaintiffs. Defendants do not refer to any portion of the record which establishes, from the evidence, that plaintiffs' view was a 175 degree view and that the interference by the pine tree above the roof of defendants' house was a 1 percent interference only.

Defendants argue that the order of the trial court, in fixing a roof-level height as the permissible height which would not cause an interfer-

ence with plaintiffs' view, was arbitrary, since the written restrictions upon which the lawsuit was based said nothing about a limitation on trees and shrubs to the height of the roof-level of the homes erected on the various properties.

There is no doubt that, if the court acted arbitrarily in fixing the roof-top level as the permitted height for trees and shrubs pursuant to the restrictive-covenant document, the order would constitute an abuse of discretion, since "'[i]n a legal sense discretion is abused whenever in the exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered.'" (*State Farm etc. Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428, 432 [304 P.2d 13].) We conclude, however, that the defendants' claim of an abuse of discretion is lacking in merit. All of the homes in the tract involved are limited to one story in height. In addition, the record reflects that the evidence established that the roof-top limit in height for trees and shrubs was necessary to preserve the view of the ocean and city from plaintiffs' property. Again, defendants point to no portion of the record to support their claim that the trial court failed to consider any appropriate public policy or the respective interests of the parties in concluding that the tree trimming ordered was necessary to effectuate the rights given to plaintiffs under the restrictive-covenant document.

## III

### DID THE TRIAL COURT IMPROPERLY INTERPRET THE RECORDED RESTRICTIVE-COVENANT DOCUMENT?

Defendants point out that the question at issue concerns the proper interpretation of various provisions of the recorded restrictive-covenant document. No extrinsic evidence was offered by any party as an aid to the interpretation contended for by such party to the action. Defendants request that we make an interpretation of the document contrary to the interpretation placed upon it by the trial court.

Defendants rely upon the principle set forth in *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], in which the court observed: "It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate

court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].'"

The basic provision to be interpreted is paragraph (11) of the written document. In pertinent part, paragraph (11) provides as follows: "[N]or shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot, and the right of entry is reserved by the Declarants to trim any tree obstructing the view of any lot."

Paragraph 14 of the document also has a reference to trees and shrubs. It provides: "No tree or shrub planted by the Declarants on any Lot or lot slope shall be removed at any time without the expressed permission of the Declarants or their successors."

Defendants urge that we give an interpretation to paragraph (11) that would establish the principle that no property owner is liable to another property owner for a tree obstructing the view unless the property owner sought to be held liable was the original planter of that tree. The pine tree on defendants' lot was not planted by defendants but by the former owner. Under the interpretation of paragraph (11) contended for by defendants, since they did not plant the particular pine tree, they would not be liable under this paragraph for the growth of the tree which now obstructs the view of plaintiffs.

Defendants also contend that, since paragraph (11) provides for a right of entry reserved to the declarants to *trim* any tree obstructing the view of any lot, the document should be interpreted to preclude a court from requiring any lot owner to trim trees which have grown to such height that they interfere with another lot owner's view. Defendants suggest that this one provision that gives the *original owner* (declarants) of all the lots a right of entry to trim trees obstructing the view of any lot, was intended to constitute the sole remedy for a lot owner whose view was being obstructed by the height of trees on adjacent lots.

In addition, defendants argue that the phrase, "obstruct the view," used in paragraph (11), is too ambiguous to be interpreted to require that trees be trimmed *to* roof-top level.

■ Defendants assert that their suggested interpretation of paragraph (11) is mandated by the rule of law that favors a strict construction of restrictive covenants and an interpretation leaning toward the unencumbered, free use of property. "Restrictive covenants will be construed strictly against persons seeking to enforce them, and in favor of the unencumbered use of the property." (*Biagini v. Hyde* (1970) 3 Cal.App.3d 877, 880 [83 Cal.Rptr. 875].) Language similar to that set forth in *Biagini* is found in other cases. (*Sain v. Silvestre* (1978) 78 Cal.App.3d 461, 474 [144 Cal.Rptr. 478]; *Terry v. James* (1977) 72 Cal.App.3d 438, 443 [140 Cal.Rptr. 201]; *Lincoln Sav. & Loan Assn. v. Riviera Estates Assn.* (1970) 7 Cal.App.3d 449, 463 [87 Cal.Rptr. 150].)

The disjointed, single-paragraph, strict construction approach to a restrictive-covenant-document interpretation urged by defendants, is unacceptable in light of the fact that "[t]here is no doubt that these rules are correct so far as they go, but they give only part of the picture." (*Bass v. Helseth* (1953) 116 Cal.App.2d 75, 81 [253 P.2d 525, 36 A.L.R.2d 853].) A limitiation on the rule of strict construction of restrictive covenants was set forth in *Lincoln Sav. & Loan Assn.* as follows: "[T]he intent of the parties and the object of the deed or restriction should govern, giving the instrument a just and fair interpretation." (*Lincoln Sav. & Loan Assn., supra*, 7 Cal.App.3d 449, 463.)

■ The restrictive-covenant document involved in the case before us is made up of 17 separate paragraphs of restrictions on the use and improvements permitted on the lots making up the tract. ■ A cardinal principle of document construction is that a document must be "construed as a whole" so as "to give effect to every part thereof [citations], and particular words or clauses must be subordinated to general intent." (*Newby v. Anderson* (1950) 36 Cal.2d 463, 470 [224 P.2d 673].)

■ The beginning paragraph of the document states that the document establishes, "the following provisions, conditions, restrictions, and covenants, upon all said lots, or any interest therein all of which shall inure to and pass with each lot and shall apply to and bind the respective successor in interest or present owner or owners thereof, and each thereof is imposed upon all said lots as a servitude in favor of each and every other of said lots of said tract as dominant tenement or tenements, . . . "

This language in a recorded restrictive-covenant document for a residential tract of lots generally has been given an effect as set forth in *Mock v. Shulman* (1964) 226 Cal.App.2d 263 [38 Cal.Rptr. 39]. The *Mock* court observed: "The court found that the restrictions were imposed upon all the lots in the tract in which the respective lots of the parties were located; they were for the mutual benefit of the entire tract and the owners of the several lots therein, ran with the land and were binding upon and enforceable by each lot owner as against all other lot owners. The restrictions were in the form that has often been held adequate to create mutual equitable servitudes, breach of which will be enjoined." (*Id.* at p. 266.) (See also, *Lincoln Savings & Loan Assn. v. Riviera Estates Assn., supra,* 7 Cal.App.3d 449, 460; *Arrowhead Mut. Service Co. v. Faust* (1968) 260 Cal.App.2d 567, 579 [67 Cal.Rptr. 325].) ■ We find this cogent observation set forth in *Hannula v. Hacienda Homes* (1949) 34 Cal.2d 442, 444-445 [211 P.2d 302, 19 A.L.R.2d 1268]: "[T]he primary object in construing restrictive covenants, as in construing all contracts, should be to effectuate the legitimate desires of the covenanting parties."

■ Viewed in context of the entire document, there is nothing vague or ambiguous about the restrictions imposed in paragraph (11). The language, "nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot," seems clearly designed to maintain the area above the one-story homes free and clear in order to preserve the view of the individual lot owners at various elevations. In making each lot both a dominant and subservient tenement, with respect to the various restrictions, paragraph (11) must be construed to subject defendants' property to the restriction against the height of trees which would interfere with a neighbor's view. We conclude, as did the trial court, that a limitation on the height of trees to roof-top level constitutes a reasonable interpretation of the language used in paragraph (11).

In view of all the restrictions and conditions contained in the restrictive covenant document, the topography of the tract and the elevation of the lots, and the limitation on structures to single-family dwellings one-story in height, the general plan created by Marquez Knolls, Inc., the owner of the lots who created the restrictive covenant document, reflects a plain intent and purpose to maintain a one-story height for all structures *and trees* in the tract in order to preserve the "view" of the individual lot owners.

## IV

### PLAINTIFFS ARE NOT BARRED FROM ENFORCING THE RESTRICTIVE COVENANT PROVISIONS BY REASON OF ANY LACHES OR WAIVER

■ Defendants assert that the restrictive-covenant document became unenforceable by reason of the doctrines of waiver and laches. Defendants rely upon the cases of *Wedum-Aldahl Co.* v. *Miller* (1937) 18 Cal.App.2d 745 [64 P.2d 762] and *Butler* v. *Holman* (1956) 146 Cal.App.2d 22 [303 P.2d 573]. These cases offer no assistance to defendants. In the *Wedum-Aldahl Co.* case, there was a change in conditions so that the court was able to observe that "[w]hen the conditions affecting a restrictive use of land have so changed as to defeat the purpose of the restriction and it has therefore become inequitable to enforce the restriction, the owner may be relieved therefrom in a proper proceeding." (*Wedum-Aldahl Co., supra,* 18 Cal.App.2d 745, 752.) And in *Butler,* the court held that the trial judge was justified in finding that the facts did not bring plaintiffs within the rule that "[l]aches is an unreasonable delay in asserting a right which causes such prejudice to an adverse party as renders the granting of relief inequitable." (*Butler, supra,* 146 Cal.App.2d 22, 28.)

The record before us is devoid of evidence that would support a finding that any conduct by plaintiffs amounted to a waiver, or that plaintiffs had delayed in bringing suit to call into play the equitable defense of laches. The testimony of one of the plaintiffs was to the effect that it was only during the three years that defendants had owned their property that the pine tree had grown above defendants' rooftop to the extent of impeding plaintiffs' view from their property.

## V

### THE RIGHTS OF THE TREE ITSELF

■ Defendants urge that we adopt a legal principle that would give their pine tree an independent right to exist, without being trimmed to rooftop level—a right that would be paramount to the rights created by the restrictive-covenant document. Unquestionably, the concept of bestowing upon nonhuman forms certain independent rights has been discussed in our legal literature. The growing recognition of the necessity to protect our environment has given some impetus to this concept, especially with respect to natural objects or parts of our environment.

(See Stone, *Should Trees Have Standing?—Toward Legal Rights for Natural Objects* (1972) 45 So.Cal.L.Rev. 450.)

A decisional law advocacy of this concept is found in a dissenting opinion in *Sierra Club* v. *Morton* (1972) 405 U.S. 727, 741 [31 L.Ed.2d 636, 647, 92 S.Ct. 1361]. There, an argument was advanced for a "federal rule that allowed environmental issues to be litigated before federal agencies or federal courts *in the name of the inanimate object* about to be despoiled, defaced, or invaded by roads and bulldozers and where injury is the subject of public outrage." (Dis. opn. of Douglas, J.) (Italics added.)

The protection of elements of our environment and natural resources has come through legislative enactments which the courts interpret and enforce but without adoption of the principle that natural objects are given independent "rights" and "standing" in the courts. The cases cited by defendants are all of this nature. (*Sierra Club* v. *Morton, supra; TVA* v. *Hill* (1978) 437 U.S. 153 [57 L.Ed.2d 117, 98 S.Ct. 2279]; *Minnesota Public Interest Research Group* v. *Butz* (D.Minn. 1975) 401 F.Supp. 1276; *National Audubon Society, Inc.* v. *Johnson* (S.D.Tex. 1970) 317 F.Supp. 1330; *State of Wyoming* v. *Hathaway* (10th Cir. 1975) 525 F.2d 66.)

Under the circumstances, we must decline defendants' request that we create, by judicial action, an independent right of existence in defendants' pine tree. Even if we were so inclined, we are compelled to take cognizance of the fact that defendants make no compelling argument for granting to their pine tree a right to exist free of being trimmed in accordance with the demands of the restrictive-covenant document which is binding on all parties to this litigation. A meaningfully significant comment is to the effect that "to say that the environment should have rights is not to say that it should have every right we can imagine, or even the same body of rights as human beings have. Nor is it to say that everything in the environment should have the same rights as every other thing in the environment." (Stone, *Should Trees Have Standing?—Toward Legal Rights for Natural Objects, supra*, at pp. 457-458.)

The judgment is affirmed.

Kingsley, Acting P. J., and Swearinger, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.