[No. H000859. Sixth Dist. May 29, 1986.]

RUDOLPH SHER et al., Plaintiffs and Appellants, v.
P. HERBERT LEIDERMAN et al., Defendants and Respondents.

COUNSEL

Paul P. Spaulding III, Dinkelspiel, Donovan & Reder and Victor M. Sher for Plaintiffs and Appellants.

Mark J. Solomon for Defendants and Respondents.

OPINION

**BRAUER, J.**—Rudolph and Bonnie Sher appeal from a judgment against them in favor of P. Herbert and Gloria Leiderman following a court trial. Their appeal presents an issue of first impression in this state, namely, whether an owner of a residence designed to make use of solar energy can state a cause of action for private nuisance when trees on his neighbor's property interfere with his solar access. We determine that California nuisance law does not provide a remedy for blockage of sunlight, and, for reasons discussed below, we decline to expand existing law.

The Shers' appeal also includes claims that the California Solar Shade Control Act applies to give them a private cause of action against the Leidermans, and that negligent infliction of emotional distress also lies. In addition they assert that the court improperly sustained a demurrer to their cause of action based on mutual equitable servitudes. We find that the

demurrer was properly sustained and that the Shers' other contentions are without merit. Accordingly we affirm the judgment in its entirety.

## The Facts

The extensive findings set forth in the trial court's statement of decision are not in dispute and form the basis for our factual summary.

In 1962 the Shers entered into a long term land lease with Stanford University. The lot they leased was located in a new residential development on the Stanford campus known as Pine Hill 2, one of five model planned subdivisions developed by Stanford for use by faculty and staff. All building and landscaping on subdivision lots was subject to Stanford's prior review and approval. Shortly after the Shers' plans were approved, the Leidermans leased an adjacent lot. They in turn obtained design approval for their home and proceeded with construction. Both families moved into their new homes in 1963 and have lived there ever since.

The Shers' lot fronts on Mayfield Avenue and is situated on the northeast slope of a hill. The Leidermans' lot is southwest of the Shers' and occupies the upper slope and the crest of the hill, fronting on Lathrop Drive. The two lots share a common boundary along the Shers' southern—and the Leidermans' northern—property line.

The Shers' home was designed and built to take advantage of the winter sun for heat and light. The home is oriented on the lot so as to present its length towards the south. South-facing windows are relatively larger than others in the house. The south side of the house is also "serrated" to expose the maximum area to the sun. A large south-facing concrete patio operates to radiate sunlight into the home's interior. Skylights add to the light inside the house and an open floor plan in the common areas increases the general circulation of light and air. Roof overhangs are designed at an angle and length to block the hot summer sun while permitting winter sunlight to enter the house. Roof and walls are well insulated. Deciduous trees and shrubs along the southern side of the house aid in shading and cooling in the summer but allow winter sunlight to reach the house.

The trial court found that the Sher home is a "passive solar" home. The design features and structures identified above form a system intended to transform solar into thermal energy. The court also found that a concomitant design goal was to create a bright and cheerful living environment. Though the home includes many passive solar features, it does not make use of any "active" solar collectors or panels. Nor does it employ any "thermal mass" for heat storage and distribution. Building materials used throughout were

typical and conventional for the time; the house does not contain any special materials primarily selected for effective thermal retention.

At the time the Shers and Leidermans designed and built their homes there were no trees on either lot. For that matter, this was true of all of Pine Hill 2. Over the years both parties, as well as their neighbors, landscaped their properties. As noted above, the Shers' landscaping was designed to enhance and complement their home's effectiveness as a solar system. The Leidermans' landscape plan was disapproved in part by the Stanford housing office, specifically in regard to a number of trees they proposed to plant within a 10 foot sewer easement along their northern property line bordering the Shers' lot. Despite the lack of approval, however, the Leidermans proceeded to implement their plan. Between 1963 and approximately 1976 they planted a large number of trees, including Monterey pine, eucalyptus, redwood, cedar and acacia. The trial court found that these trees were planted to beautify the appearance of the Leiderman property, to attract birds and other small creatures, and to provide shade and privacy. The court found no intent on the Leidermans' part to deprive the Shers of sunlight.

In 1972, the Shers discovered that certain trees on the Leiderman property cast shadows on the Sher house in the wintertime. The offending trees were topped the following spring and the cost was borne by the Shers. In 1977 several other Leiderman trees were removed because their continued growth in the sewer easement posed a threat to the sewer line. The cost of this removal was shared by the Shers and Stanford. Further tree work was done at the Shers' expense in the winter of 1979. The Leidermans themselves also engaged in certain tree trimming and removal over the years at a cost to them of approximately $4,000. Since 1979, however, the Leidermans have refused either to undertake any further trimming on their own or to cooperate with the Shers in this regard.

At time of trial trees on the Leiderman property completely blocked the sun to much of the Sher home in the winter months. From December 21 to February 10, the central portion of the Sher home was cast in shadow between 10 a.m. and 2 p.m. The Shers added a skylight over their kitchen area to help alleviate the problem, but now this too is largely shaded during the winter.

The shade problem has transformed the formerly cheerful and sunny ambience of the Sher home; the interior is now dark and dismal in the winter months. The shading has also had an adverse impact on the home's thermal performance. The Shers' expert testified that heat loss during the winter months amounted to an equivalent of approximately 60 therms of natural gas. This converts into $30 to $60 per season in heating costs. Two experts

testified that the loss of sunlight to the Shers' house has resulted in a diminution of market value between $15,000 and $45,000. It appears, however, that this loss of value is attributable more to the gloomy atmosphere of the house than to its decreased effectiveness as a solar system. The court also found that the Shers have suffered actual and serious emotional distress as a result of the blockage of sunlight to their home.

In order to restore sunlight to the Shers' home during the winter months it would be necessary to trim certain trees on the Leiderman property, top others and remove those where topping would destroy the character of the tree or possibly kill it. Annual trimming would also be necessary.

The Shers proceeded to trial on three causes of action: 1) private nuisance; 2) public nuisance under the California Solar Shade Control Act (Pub. Resources Code § 25980 et seq.); and 3) negligent infliction of emotional distress. After a six day trial, which included a visit to the property, judgment was entered against them on all three causes of action. We will discuss these in turn, after which we will take up the Shers' claim that their first amended complaint stated a cause of action for breach of equitable obligations.

### DISCUSSION

#### 1. *Private Nuisance*

■ The trial court found that the relief requested by the Shers would amount to burdening the Leiderman property with a permanent easement for passage of light to the Sher property. It is well settled in California that a landowner has no easement for light and air over adjoining land, in the absence of an express grant or covenant. (*Katcher* v. *Home S. & L. Assn.* (1966) 245 Cal.App.2d 425, 429 [53 Cal.Rptr. 923]; *Pacifica Homeowners' Assn.* v. *Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1152 [224 Cal.Rptr. 380].) ■ Nuisance law is in accord: blockage of light to a neighbor's property, except in cases where malice is the overriding motive, does not constitute actionable nuisance, regardless of the impact on the injured party's property or person. (*Haehlen* v. *Wilson* (1936) 11 Cal.App.2d 437, 441 [54 P.2d 62].)

Only one court in the country, the Wisconsin Supreme Court, has departed from established law in this field. (*Prah* v. *Maretti* (1982) 108 Wis.2d 223 [321 N.W.2d 182, 29 A.L.R.4th 324].)[1] In the *Prah* case plaintiff's house

[1]At oral argument on this cause, we were informed by appellants that another court, namely the New Hampshire Supreme Court, has recently issued an opinion which follows *Prah* v. *Maretti.* (*Tenn* v. *889 Associates, Ltd.* (N.H. 1985) 500 A.2d 366.) Since the *Tenn* opinion does not deviate in any material way from the reasoning of the Wisconsin court, we limit our discussion to the one case.

was equipped with roof-top solar collectors which supplied energy for heat and hot water. Defendant purchased a lot adjacent to plaintiff's to the south and planned construction of his residence in a location where it would substantially shade plaintiff's collectors. Plaintiff sought injunctive relief and the matter reached the Wisconsin Supreme Court following summary judgment for defendant.

The court opened its discussion by observing that the interests protected by nuisance law are broadly defined to include practically any disturbance of the enjoyment of property. "'The phrase "interest in the use and enjoyment of land" is used [in the Rest.2d Torts] in a broad sense. It comprehends not only the interests that a person may have in the actual present use of land for residential, agricultural, commercial, industrial and other purposes, but also his interests in having the present use value of the land unimpaired by changes in its physical condition. . . . "Interest in use and enjoyment" also comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land is often as important to a person as freedom from physical interruption with his use or freedom from detrimental change in the physical condition of the land itself.'" (*Prah* v. *Maretti, supra,* 108 Wis.2d 223 [321 N.W.2d at p. 187], quoting Rest.2d Torts (1977) § 821D, com. b, p. 101.)

Although obstruction of sunlight would appear to fall within this concept of a private nuisance as "a nontrespassory invasion of another's interest in the use and enjoyment of land" (Rest.2d Torts, § 821), courts have traditionally refused to consider a landowner's access to sunlight a protected interest. This judicial posture stems, in the Wisconsin court's view, from the early repudiation by American courts of the English common law "Doctrine of Ancient Lights," under which a landowner could acquire a prescriptive easement to receive sunlight over adjoining property. Such a doctrine was ill-suited to conditions existing in the early part of this century in a new and rapidly growing country. At that time society had a significant interest in encouraging unrestricted land development. Moreover a landowner's rights to use his land were virtually unlimited; it was thought that he owned to the center of the earth and up to the heavens. In contrast, light had little social importance beyond its value for aesthetic enjoyment or illumination.

The "light and air easement" cases, which are still the controlling law in California today, emerged from this background, and, it is argued, reflect priorities and policies which are obsolete today. Today rampant land development is no longer favored. Furthermore, it has become an accepted notion that a landowner's right to use his land as he pleases is subject to

regulation. Most significant, however, as chronicled in depth in the Shers' opening brief, is the recent public recognition of sunlight, not only for its aesthetic value but also as an important alternative energy source, with far-reaching economic impact. One has only to look at the proliferation of legislation in recent years emanating from all levels of government[2] to realize that promotion of the use of solar energy is of paramount public interest today.

■ Because of this inversion of social priorities over the years, it is urged that interference with solar access should no longer be considered a "mere" obstruction of light, as it once was; today it may in fact amount to substantial and perceptible harm, certainly no less substantial than the harm caused by other recognized nuisances such as unpleasant odors, noise, smoke, vibrations or dust. The *Prah* court took the view that common law rules remain vital only if they can adapt to changing social values and conditions: "[t]he law of private nuisance is better suited to resolve land-owners' disputes about property development in the 1980's [*sic*] than is a rigid rule which does not recognize a landowner's interest in access to sunlight." (*Prah* v. *Maretti, supra,* 108 Wis.2d 223 [321 N.W.2d at p. 190].)

The court tempered its holding with the proviso that obstruction of access to sunlight would not necessarily constitute a nuisance in all cases. A plaintiff must still prove that the action complained of was unreasonable under all of the circumstances. This comports with the law as stated in the Restatement Second of Torts. In their discussion of private nuisance law, the authors of that treatise do not suggest any special treatment for cases involving ob-struction of light and air. ■ The general rule is that in determining whether any interference with use and enjoyment of land is unreasonable, a court must balance the gravity of the harm against the utility of the conduct. (Rest.2d Torts, § 826.)

■ The Shers also point out that the statutory definition of nuisance in the California Civil Code, section 3479, as "anything" which is "an

---

[2]For example: Renewable Energy Resources Act of 1980 (42 U.S.C. § 7371); Solar Energy and Energy Conservation Bank Act of 1980 (12 U.S.C. § 3601); Solar Energy Research, Development and Demonstration Act of 1974 (42 U.S.C. §§ 2473, 5501); Small Business Energy Loan Act (15 U.S.C. § 631); Energy Conservation and Production Act (42 U.S.C. § 6881); California Solar Rights Act of 1978 (Civ. Code, §§ 714, 801); California Alternative Energy Source Financing Authority Act (Pub. Resources Code, § 26000); "Energy Con-servation" (div. C14, County of Santa Clara Ord. Code (1980)).

obstruction to the free use of property" so as to "interfere with the comfortable enjoyment of life or property" is broad enough to encompass a cause of action based on unreasonable obstruction of light. They can, however, cite us to no California case which has so applied section 3479.

The case of *Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116 [99 Cal.Rptr. 350] is relied upon for the proposition that obstruction of light can be a nuisance where substantial harm is alleged. That case involved pollution of the air by smoke emanating from defendant's factory. One plaintiff claimed injury by reason of the smoke obstructing his view. In discussing whether this constituted a claim for private nuisance the court distinguished those cases where the injury complained of is the "mere" obstruction of view or light from those cases where plaintiff's comfortable enjoyment of his property was otherwise impaired by the claimed nuisance. (*Id.,* at pp. 126-127.) The court concluded that the plaintiff in *Venuto* had not stated a cause of action since he had only alleged that emissions from defendant's plant interfered with his view. "He has not alleged any perceptible injury to his property nor has he alleged that these emissions pollute the air so as to sensibly impair the enjoyment of his property." Shers argue that this language implies that a plaintiff who *can* allege perceptible injury to his property from obstruction of light, as they have done, states a cause of action. We do not agree. The *Venuto* case concerned emissions of smoke affecting plaintiff's property, an occurrence for which nuisance law has traditionally provided protection. (*Eaton v. Klimm* (1933) 217 Cal. 362, 368 [18 P.2d 678]; *Snow v. Marian Realty Co.* (1931) 212 Cal. 622, 625 [299 P. 720].) The court focused on the narrow issue whether plaintiff could state a cognizable injury to his property as a result of defendant's smoke, and concluded that obstruction of light and view is not such an injury. In contrast, the Shers' predicament, shading of their house by a neighbor's trees, has never come under the protection of private nuisance law, no matter what the harm to plaintiff. (*Haelen v. Wilson, supra,* 11 Cal.App.2d 437, 441.) The Shers' allegations of perceptible injury cannot create a cause of action where none exists.

 Turning to the Shers', and the Wisconsin court's, policy arguments favoring a change in the law of private nuisance, we take the position that it is solely within the province of the Legislature to gauge the relative importance of social policies and decide whether to effect a change in the law. (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935].) The California Legislature has already seen fit to carve out an exception to established nuisance law, in the form of the California Solar Shade Control Act.[3] Under this law, after January 1, 1979, a property owner

---

[3]Application of the Solar Shade Control Act to our case is discussed more fully in the following section.

cannot plant a tree, or allow one to grow, which will shade more than 10 percent of a neighbor's solar collector between the hours of 10 a.m. and 2 p.m. The property owner must be given 30 days notice, after which, if he has failed to remove or alter the offending tree(s), he is guilty of a public nuisance, punishable by a fine not to exceed $1,000 per day for each day the violation continues.

We are unwilling to intrude into the precise area of the law where legislative action is being taken. If the Legislature intended to limit its protection of solar access to those situations circumscribed by the Solar Shade Control Act, our expansion of the nuisance law beyond those bounds would be unwarranted. On the other hand, the Solar Shade Control Act may well represent the initial phase of a more comprehensive legislative plan to guarantee solar access; in that case, judicial interference could undermine the orderly development of such a scheme.

In addition to these concerns, we are troubled by certain aspects of the Shers' thesis. Though the Solar Age may indeed be upon us, it is not so easily conceded that individual property rights are no longer important policy considerations. The Shers contend that the land use cases (*Village of Euclid, Ohio* v. *Amber Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114], and progeny) and subsequent widespread use of zoning and other local regulation have eroded the vitality of these policies. As the dissent in *Prah* v. *Maretti, supra,* 108 Wis.2d 223 [321 N.W.2d at p. 194] pointed out, however, expanded use of the police power and eminent domain only supports the conclusion that society has increasingly seen fit to regulate private land use for the *public* health, safety, morals, or welfare. The case before us concerns the imposition of restrictions on land use for a *private* benefit, a far different proposition in our view. A landowner's right to use his property lawfully to meet his legitimate needs is a fundamental precept of a free society. Though his use may be made subject to limitations for the sake of the public good, it cannot be said that his rights vis-à-vis adjoining owners are thereby diluted.

Moreover, established principles of due process and property law would seem to require that a property owner, or prospective purchaser, have notice of limitations on the use of his property. Zoning and other local ordinances provide such notice, as do the recording laws, while abatement through a nuisance action would not.[4] The argument is made that local regulatory schemes would not provide an effective remedy as between neighbors. On the contrary, we find that a carefully constructed statutory

---

[4]We note additionally that expansion of the law in this area would have the undesired effect of fostering ill will and a proliferation of litigation between neighbors.

plan, such as that contained in the enabling legislation passed in Wisconsin, would both protect the owner of a property that utilizes solar energy and also provide notice to an adjacent owner of restrictions on his right to develop his land. Under the Wisconsin legislation, a property owner who is planning or designing a solar energy system may apply to the local agency for a solar access permit. When the application is lodged, the applicant must deliver a notice to the owner of any property whose use the applicant proposes to restrict. The notice informs the owner that the permit, if granted, might affect that owner's right to develop his property. Any person so notified may request a hearing. If the local agency, after considering all the circumstances, grants such a permit, it is then recorded in the public records as a restriction on all affected properties.

In our view a scheme such as this presents a sensible and equitable solution to problems of competing interests arising from increased use of solar energy. Since legislative solutions are feasible and since we believe that determination of policy is peculiarly a legislative function under the Constitution, we defer to that body, and affirm the trial court's judgment on this cause of action.[5]

### 2. *The Solar Shade Control Act*

■ The Solar Shade Control Act (the Act),[6] discussed briefly in the preceding section, provides limited protection to owners of solar collectors from shading caused by trees on adjacent properties. If a tree is allowed to grow to a point where it shades more than 10 percent of a neighbor's collector during certain hours of the day, the owner of the collector has recourse to the local city attorney or district attorney. The complainant must establish to the satisfaction of the prosecutor that the violation is occurring. If satisfied, the prosecutor then serves the owner of the offending tree(s) with a notice to abate the violation. If this is not accomplished within 30 days of receipt of the notice, the complainant can commence an action by filing an affidavit with the prosecutor. (§ 25983.)

■ The Shers applied to the Santa Clara County District Attorney's office pursuant to the above section. The deputy district attorney, however, after investigating the matter, determined that the Act did not apply to the Shers' situation and refused to issue a notice to abate.

---

[5]For the same reason we decline the Shers' invitation that we adopt the water rights doctrine of prior appropriation as a means of regulating solar access in this state.

[6]Public Resources Code sections 25980-25986. Statutory references throughout this section are to this code.

The threshold issue is whether the definition of solar collector in section 25981 of the Act applies to a home such as the Shers'. ■ At the outset we note that the interpretation and applicability of a statute is clearly a question of law (*Dean W. Knight & Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d 300 [202 Cal.Rptr. 44]), requiring an independent determination by the reviewing court (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839]). In so doing we employ traditional rules of statutory construction in order to "ascertain the intent of the [legislators] . . . so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ We give effect to the words of the statute "according to the usual, ordinary import of the language," (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947]) and construe them "in context, keeping in mind the nature and obvious purpose of the statute where they appear." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) ■ Moreover, we try to harmonize various parts of a legislative enactment "by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Board* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Finally we note here that no case law has developed regarding the Solar Shade Control Act; the question of its applicability to passive solar homes is one of first impression.

■ Bearing the foregoing rules in mind, we turn to the definition of solar collector contained in section 25981. This section reads: "As used in this chapter, 'solar collector' means a fixed device, structure, or part of a device or structure, which is used primarily to transform solar energy into thermal, chemical, or electrical energy. The solar collector shall be used as part of a system which makes use of solar energy for any or all of the following purposes: (1) water heating, (2) space heating or cooling, and (3) power generation." The trial court found that since the Shers' house contained no "solar collectors" the Act did not apply. The Shers argue that the Act was intended to give broad protection to both active and passive solar homes and that parts of the structure of their house qualify as solar collectors under the definition set forth above.

The Shers' argument is based on the words "structure, or part of a . . . structure . . . used as a part of a system which makes use of solar energy." They point out that the trial court specifically found that the design features of their house "were intended to transform solar energy into thermal energy, and are used as part of a system which makes use of solar energy for space heating and cooling." Their south-facing windows and skylights are clearly "parts of a structure" and form an integral part of their solar energy system.

This interpretation of the language of the statute, however, fails to take into account the modifying word "primarily." Though it may be true that the Shers' south-facing windows were intended to catch the rays of the winter sun and provide warmth to the interior of the house, it cannot be said that the *primary* function of a window is to convert solar into thermal energy.

Furthermore, the interpretation suggested by the Shers, if followed to its logical conclusion, would give rise to a host of other definitional problems. Does *any* south-facing window in *any* home qualify as a solar collector? What in fact is a "south-facing" window? The Shers' home, for example, is oriented approximately 45 degrees off the east-west axis; their windows actually face southwest. Would the 10 percent shading factor be calculated on all windows and skylights or on each separately? The Shers installed a concrete patio on the southern side of their home to radiate heat and light to the home's interior. Is this also a collector? Well-insulated roof and walls are listed in the trial court's statement of decision as integral parts of the Shers' passive solar system. If these too are "parts of a structure" which make use of solar energy, then every square inch of the Sher home, and others like it, would be rendered immune from shading by the operation of the Act. This clearly extends the scope of the Act to absurd proportions. Moreover, we do not believe that the Legislature could have intended to impose upon local law enforcement agencies the enormous task of making these factual determinations whenever a collector is not readily identifiable as such.

The Shers point out that the stated legislative purpose of the Act indicates an intent to give the broadest possible protection to alternative energy systems. Section 25980 reads in part: "It is the policy of the state to promote all feasible means of energy conservation and all feasible uses of alternative energy supply sources." This same section, however, speaks of imposing only "specific and limited controls on trees and shrubs."

The Shers argue further that legislative intent to include passive solar homes under the Act's protection is shown by the legislators' decision to add the words "structure or part of a structure" to the definition of collector. Early drafts of the assembly bill (Assem. Bill No. 2321) referred only to "a fixed device." Though we agree that the final language is more expansive, it is nonetheless still subject to the delimiting effect of the word "primarily."

Another section of the Act, section 25982, lends support to our interpretation. That section places certain restrictions on solar collectors. They must be set back not less than five feet from the property line and not less

than ten feet above the ground, and in addition must comply with all local setback regulations. Logically these restrictions refer to a structure or device other than the house itself, since the house would presumably already comply with local setbacks.

Finally we note that the Legislature was aware that solar systems can be active or passive. Section 25986 of the Act provides: "Any person who plans a passive or natural solar heating system or cooling system or heating and cooling system which would impact on an adjacent active solar system may seek equitable relief in a court of competent jurisdiction to exempt such system from the provisions of this chapter. The court may grant such an exemption based on a finding that the passive or natural system would provide a demonstrably greater net energy savings than the active system which would be impacted." This section shows an intent to protect a "passive or natural system" in the specific circumstance where its operation competes with a neighboring active system. Had the legislators intended to accord passive systems the broader protection provided to "solar collectors" under the Act, they could easily have done so by specific inclusion in the statutory definition.

In summary, we find that the Solar Shade Control Act was not intended to apply to provide protection from shading to exclusively passive solar homes. Since we decide the Shers' claim on this basis, we do not find it necessary to address the other issues raised in the briefs regarding the Act.

### 3. *Negligent Infliction of Emotional Distress*

The trial court specifically found that the Shers had suffered actual and serious emotional distress as a result of the shading of their house over the years. ▮ Although emotional distress is a proper element of damages in a nuisance action (*Griffin* v. *Northridge* (1944) 67 Cal.App.2d 69 [153 P.2d 800]), the Shers cannot state a cause of action for nuisance under California law, as discussed above. ▮ In regard to their claim of negligent infliction of emotional distress as a separate cause of action, the trial court concluded that 1) such a cause of action does not lie where the injury is to property and there is no special relationship between the parties, and 2) the Leidermans' acts did not otherwise constitute breach of any duty owed to the Shers. We agree with these findings.

The case of *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008 [200 Cal.Rptr. 746] states the law in California. In that case defendant's tractor ran amuck and rolled into plaintiff's house, causing serious damage to a part of the house where the children's playroom was located. Although neither plaintiff nor her children were at home at the time of the accident,

she claimed emotional distress resulting from the discovery of the damage and the necessary relocation of her family to a hotel until repairs were accomplished. The court specifically addressed the prospect of extending present law to allow for damages for emotional distress resulting solely from negligent injury to property. It concluded: "No California case has allowed recovery for emotional distress arising solely out of property damage, absent a threshold showing of some preexisting relationship or intentional tort. This case involves no preexisting relationship between the parties. Thus, we do not feel it appropriate to extend recovery for emotional distress here." (*Id.,* at p. 1012.)

A review of the cases where recovery for emotional distress has been allowed in conjunction with injuries to property reveals that the types of preexisting relationships which give rise to a duty of care involve an aspect of trust and confidence. *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470] and *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173] both involved relationships between an insurer and its insured. Plaintiffs in these cases were parties to a contract which directly concerned their "comfort, happiness and personal esteem." In addition in both cases defendants were held to have breached the contract in bad faith. In *Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844 [88 Cal.Rptr. 39] defendant was a bailee who had been entrusted with family heirlooms known by him to be of great sentimental value to plaintiff.

The Shers and Leidermans have no contractual or trust relationship. The Shers nonetheless argue that their long history as neighbors constitutes a preexisting relationship sufficient to except them from the law as stated in *Cooper*. ▮ Mere ownership of adjoining lots, however, does not give rise to a heightened duty of care such as was contemplated in *Cooper* and the cases cited above.

The Shers contend that there are thousands of California cases which deal with the important duties of a landowner with regard to adjacent landowners. They offer two such cases, both of which are easily distinguishable.

In *Kennedy* v. *Rosecrans Gardens, Inc.* (1952) 114 Cal.App.2d 87 [249 P.2d 593] defendant's activities in grading and watering his land caused large amounts of earth and debris to be deposited on plaintiff's land. The court in that case observed that defendant had a duty to protect his neighbor's property from injury caused by his grading. This observation, however, was not in reference to any landowner's duty giving rise to a negligence cause of action, since the case was based solely on trespass, an intentional tort.

In the second case of *Coole* v. *Haskins* (1943) 57 Cal.App.2d 737 [135 P.2d 176], defendant allowed garbage to accumulate on his property. The garbage attracted rats which eventually found their way into plaintiffs' apartment next door and bit plaintiffs. Although it was found that defendant had breached a "duty" to his neighbor, there was also a preexisting contractual relationship of lessor-lessee between the parties. Moreover, in not controlling the vermin infestation, defendant was found to be in violation of the law.[7]

■ The trial court in the case before us found that the Leidermans' activities in planting trees and allowing them to grow constituted a reasonable use and enjoyment of their property. In the absence of any unlawful act or any special relationship creating a duty, no cause of action for negligent infliction of emotional distress lies here.

### 4. *Breach of Equitable Obligations*

■ Initially we note that an order sustaining a demurrer is not appealable. (*Beazell* v. *Schrader* (1962) 205 Cal.App.2d 673, 674.) Moreover, the Shers appealed only from the judgment after trial, which makes no mention of dismissal of those causes of action as to which demurrers were sustained.[8] Since the matter has been fully briefed, however, and since no prejudice results to respondent, we order that the judgment be amended by adding a paragraph dismissing the third, fourth, and sixth causes of action based on the sustaining of demurrers without leave to amend. (*Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 524 [322 P.2d 933], overruled on another ground in *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 900 [157 Cal.Rptr. 693, 598 P.2d 854]; *Donald J.* v. *Evna M.* (1978) 81 Cal.App.3d 929, 935 [147 Cal.Rptr. 15].) We then construe the Shers' appeal to be from the judgment as amended. (*Smith* v. *Smith* (1954) 126 Cal.App.2d 194, 195 [272 P.2d 118].)

■ The standard of review is similar to that on appeal from summary judgment: the judgment of dismissal must be affirmed if the proponent of the demurrer has shown that he has conclusively negated a necessary element of plaintiffs' cause of action, thereby demonstrating that there is no factual

---

[7]The Shers cite two additional cases in their reply brief. (*Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271 [288 P.2d 507]; *Herzog* v. *Grosso* (1953) 41 Cal.2d 219, 225 [259 P.2d 429].) Both are inapposite since both involved recovery of damages for emotional distress flowing from causes of action for nuisance or trespass, neither of which is present here.

[8]In addition to the cause of action discussed in this section, demurrers were sustained as to the Shers' third cause of action ("Spite Fence": Civ. Code § 841.4) and fourth cause of action ("Intentional Infliction of Emotional Distress"). Appellants evidently do not challenge the ruling as to the third and fourth counts.

basis for relief on any theory reasonably contemplated by the pleadings. (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 666 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].)

The leases executed by both Shers and Leidermans with Stanford contain identical conditions. Paragraph 6 of the lease requires lessees who construct residences to do so "in accordance with plans and specifications (including landscaping plans) to be approved in writing by Lessor prior to commencement of construction." Alterations or additions to plans must also be approved. The "Standards for Properties and Residences in Pine Hill Subdivisions" (the Standards) state that standards "have been developed . . . with the objective of achieving an attractive residential development which will meet the needs of the entire cross section" of residents, and additionally that landscaping "shall be appropriate for the size and terrain of individual lots and shall conform to plans submitted to and approved" by the University.

The Shers made the following allegations in their sixth cause of action: 1) the leases were entered into as a part of a general scheme or plan of real estate development by Stanford; 2) the provisions in the leases and the standards relating to improvements and landscaping were imposed for the mutual and reciprocal benefit of all lots and lessees within the subdivision; 3) the dominant estate consists of the entire subdivision while each leased lot constitutes a servient estate; 4) these provisions are intended to be binding on and enforceable by each lessee against all the other lessees; 5) the Leidermans were aware of the lease restrictions; and 6) the Leidermans breached their lease agreement by executing their landscaping without full approval of their plans, planting trees in the sewer easement after specific prohibition by Stanford, and altering their landscaping plan without applying for approval of the changes.

Although at first glance these allegations appear to state a cause of action to enforce mutual equitable servitudes (see, e.g., *Werner* v. *Graham* (1919) 181 Cal. 174, 183-185 [183 P. 945]; *Terry* v. *James* (1977) 72 Cal.App.3d 438, 442 [140 Cal.Rptr. 201]), upon closer examination there is absolutely no factual basis for the Shers' fourth allegation, that conditions contained in the lease and the Standards were intended to be enforceable by each lessee against all others. Indeed the allegations themselves indicate the contrary; the dominant tenement, which under the law of equitable servitudes would be the property carrying a right of enforcement, is identified as "the entire subdivision." Furthermore, there is no language in the leases, or in the Standards, which limits the size, number or placement of trees on each lot.

In those cases which have found enforceable equitable servitudes, the conveyancing documents reflect a specific intent that the restriction be

enforceable, either by directly providing for a right of enforcement or by the degree of specificity with which the restriction is drawn, or both. For example, in *Ezer* v. *Fuchsloch* (1979) 99 Cal.App.3d 849 [160 Cal.Rptr. 486, 13 A.L.R.4th 1333] plaintiff and defendant owned neighboring lots on a hillside subdivision in Pacific Palisades. A declaration of restrictions had been filed by the developer of the subdivision. Paragraph 11 of this document read: "'[N]or shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot . . . .'" (*Id.,* at p. 860.) The court found that this language gave rise to an enforceable right of one landowner against another, especially in light of the opening paragraph of the declaration which provided: "'the following provisions, conditions, restrictions, and covenants, upon all said lots, . . . and each thereof is [*sic*] imposed upon all said lots as a servitude *in favor of each and every other of said lots of said tract as dominant tenement or tenements, . . .*'" (*Id.,* at p. 861; italics added.)

Likewise in the case of *Mock* v. *Shulman* (1964) 226 Cal.App.2d 263 [38 Cal.Rptr. 39], plaintiff and defendant owned adjacent lots in a Los Angeles tract. One of the restrictions imposed by the developer and contained in all of the deeds was that "'No fence, wall or hedge over six feet in height shall be erected or grown or permitted to exist on any lot or lots in said tract within fifteen feet of any boundary line of any lot . . . .'" (*Id.,* at p. 265.) The court found that such specific language in the deed constituted a restriction on each lot which ran with the land and was binding on and enforceable by each lot owner as against all other lot owners.

Our case is quite different. There is no restriction of sufficient specificity to be enforceable by one lot owner against another. The only condition imposed on all lessees is that any architectural or landscaping plans be approved by Stanford. There is no language in the leases, however, which supports an inference that the parties intended that each lessee have a right of approval in regard to the landscaping of each leased lot. Rather, approval is left entirely to the discretion of the lessor.

The recent case of *Ironwood Owners Assn. IX* v. *Solomon* (1986) 178 Cal.App.3d 766 [224 Cal.Rptr. 18] involves facts similar to ours. Defendants purchased a lot in the Ironwood Country Club, a planned unit development. The covenants, conditions and restrictions provided that all lot owners, before proceeding with any building or landscaping, file a plan with the architectural control committee and obtain written approval. The defendants planted eight tall date palm trees without applying for or obtaining such approval. The trial court granted the homeowners' association a mandatory injunction compelling removal of the trees. Although the Court of Appeal reversed for further factual findings, it did recognize such a condition to be

enforceable. The right of enforcement, however, lies with the association of all the homeowners, for whose benefit the condition was imposed. We can find no case, and we have been cited to none, where a condition requiring architectural approval by a third party gives rise to mutual rights of enforcement among individual lot owners.

The Shers cite the case of *Hudson Oil Co.* v. *Shortstop* (1980) 111 Cal.App.3d 488 [168 Cal.Rptr. 801] for the proposition that they have an equitable right to enforce the Leidermans' contractual agreement with Stanford. In the *Hudson Oil* case, a lease contained a provision that the lessors not allow a service station to be built on land owned by them adjacent to the leased premises. The issue raised was whether the lessee's successor could enforce this condition against a subsequent purchaser from the lessor. The court found that an enforceable equitable servitude had been created. That case is readily distinguishable from ours, however, in light of the specificity of the lease provision and the fact that the lease clearly identified the lessee's property as the dominant tenement and the lessor's property as the servient tenement, thus creating a right of enforcement in one against the other.[9]

In summary, we find that the Shers cannot state all the elements of a cause of action for breach of equitable obligations against the Leidermans based on the lease agreement and the Standards attached to their first amended complaint. Since the pleading cannot be further amended to cure the defect, the demurrer was properly sustained.

Judgment as amended is affirmed.

Agliano, P. J., and Chang, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied August 28, 1986.

---

[9]The only other case cited by the Shers, *Grange Co.* v. *Simmons* (1962) 203 Cal.App.2d 567 [21 Cal.Rptr. 757], is inapposite here. That case addressed the issue whether a grantee who subsequently sold to another was obliged to perform a covenant contained in the original deed and running with the land.

*Assigned by the Chairperson of the Judicial Council.