[No. G004282. Fourth Dist., Div. Three. Mar. 31, 1989.]

Estate of BESSIE CLAFFEY, Deceased.
MONROE THOMAS McKENZIE et al., Claimants and Appellants,
v.
DOROTHY CREEKS, Claimant and Respondent.

**COUNSEL**

Cummings & Kemp and Audrey L. Myer for Claimants and Appellants.

Dirk Van Tatenhove for Claimant and Respondent.

**OPINION**

**SONENSHINE, J.**—Monroe Thomas McKenzie and Janet Turner appeal a judgment denying them, as stepchildren of Bessie Claffey, any entitlement to Claffey's estate. They contend the trial court prejudicially erred in instructing the jury to find a "family relationship," rather than a mere stepchild/stepparent relationship, as a prerequisite to their intestate succession.

I

Thomas and Janet are the children of John and Edythe McKenzie. The McKenzies were divorced in March 1934. Custody of Thomas and Janet, 10

and 7 years of age respectively at the time of divorce, was granted to the mother pursuant to stipulation of the parties. Thereafter John married Bessie Stokes in April 1935. After John's death in 1948, Bessie married Edward Claffey from whom she obtained a divorce in 1953. Bessie died intestate in April 1985.

On August 30, 1985, Thomas and Janet filed statements of claim of interest in the estate. (Prob. Code, § 1080.)[1] The statements contain no allegation they lived with their father and Bessie. Nonetheless, they claimed as stepchildren they were Bessie's "closest heirs at law," because a "parent/child relationship" arose upon her marriage to John. They attribute Bessie's failure to adopt them to the John/Edythe divorce which was "so bitter that [Edythe] refused the request of Bessie Claffey to adopt [them]."

On September 19, Dorothy Creeks filed a statement of interest as a first cousin of Bessie, attaching a list of other known heirs. She stated the property "consists of cash in the approximate amount of $322,000 and other property with an approximate value of $20,000, all the separate property of the deceased."

The opposing statements placed the matter of inheritance at issue; Thomas and Janet requested a jury, and trial began in June 1986. By special verdict, the jury found against Thomas and Janet.

## II

Prior to January 1, 1985, a stepchild had no right to inherit from a stepparent. On that date, a general revision of a large portion of the Probate Code took effect. One such provision was the addition of section 6408, setting forth the requirements for establishing a parent and child relationship "for the purpose of determining intestate succession . . . ." The relationship exists between a child and his or her natural parent "regardless of the marital status of the natural parents" (§ 6408, subd. (a)(1)) and "between an adopted person and his or her adopting parent or parents." (§ 6408, subd. (a)(2).)

The innovative portion, adapted from the Uniform Probate Code, provided: "The relationship between a person and his or her foster parent or stepparent has the same effect as if it were an adoptive relationship if (A) the relationship began during the person's minority and continued throughout the parties' joint lifetimes and (B) it is established by clear and convinc-

---

[1] All statutory references are to the Probate Code.

ing evidence that the foster parent or stepparent would have adopted the person but for a legal barrier." (§ 6408, former subd. (a)(3).)[2]

Here, the trial court determined the "relationship" referenced above contemplated one "like that of " a natural parent and child in the sense of a "family" relationship. Consequently, the instructions and the special verdict forms contained that language. The jurors were told Thomas and Janet had the burden of establishing, by a preponderance of the evidence, "a relationship like that of parent and child between themselves and Bessie . . . ." The facts necessary to establish the relationship were (1) Thomas' and Janet's father married Bessie while they were minors, (2) they had a "family relationship" during their minority, and (3) "a parent and child family relationship existed between Bessie and [the children] which began while [they were minors] and continued throughout their joint lifetimes."

By special verdict, the jury found no "parent/child-like family relationship between BESSIE CLAFFEY and [the stepchildren] [to] exist during [the stepchildren's] minority and continue throughout their joint lifetimes." They further found Edythe and Bessie discussed only "temporary possession" of the children for medical reasons;[3] and although there was a legal barrier to adoption, there was no clear and convincing evidence Bessie would have adopted the stepchildren but for that barrier.

### III

■■■ Thomas objects to the trial court's insertion of the term "family" in the instructions and verdict forms presented to the jury. He claims the court "instilled a certain vision of the type of relationship necessary for § 6408 to apply which is not required by the literal meaning of § 6408." In particular, he and Janet insist the "relationship" in question is merely "a relationship between a person and his or her stepparent or a 'stepchild/stepparent' relationship." We disagree.

The meaning of section 6408, subdivision (a)(3) is not so abundantly clear as Thomas contends. The term "relationship" in subdivision (a)(3)(A) can-

---

[2] The subdivision was amended after Bessie's death, deleting the terminology "has the same effect as if it were an adoptive relationship," and replacing it with the following: "For the purpose of determining intestate succession by a person . . . from or through a . . . stepparent, the relationship of parent and child exists . . . ." The comment of the Law Revision Commission indicates the change was made to avert "the possible undesirable effect of cutting off the right of inheritance of a natural parent who refused to consent to adoption of the child by a foster parent or stepparent."

[3] Bessie was a medical doctor and performed tonsillectomies on Thomas and Janet. They each spent several days recovering under Bessie's care in her home.

not refer solely to the dictionary meaning, i.e., the stepchild/stepparent relationship that arises upon the natural parent's remarriage. ■ ■
■ ■ If that were true, every remarriage, standing alone, would satisfy part (A) whether the new partner even knew the children or was ever allowed to see them.[4] Consequently, the necessary "relationship," existing during minority and continuing throughout the parties' lifetime, must encompass something more than an exchange of wedding vows between the natural father and a stranger.[5]

■ " ' "The most fundamental rule of statutory construction is that 'the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.]" ' " (*Jutzi v. County of Los Angeles* (1987) 196 Cal.App.3d 637, 650 [242 Cal.Rptr. 74].) Section 6408, a part of the revision of the statutes relating to wills and intestate succession, was drafted by and proposed to the Legislature by the California Law Revision Commission. The initial presentation contained no reference to stepchildren except as they were officially adopted by the stepparent. Comment to the section stated, "A person who is only a stepchild . . . is not a child." A later recommendation by the commission's probate consultant suggested the addition of what would become subdivision (a)(3). The consultant noted, under the proposed addition, provision would be made "for step- and foster children *in very limited situations*, with the necessary safeguards incorporated by treating the case like an adoption . . . ." (Italics added.) The proposal was accepted at the next revision committee meeting.

As reworked and amended, the comprehensive redrafting of the Probate Code was known as Assembly Bill No. 25 and contained subdivision (a)(3) above. The commission's "Explanation of Assembly Bill No. 25" specifically refers to establishment of a stepchild's right to inherit as based on a "family relationship." In its report to the Assembly, the Committee on the Judiciary digested the relevant section as follows: "Gives a foster child and a stepchild the same status as an adopted child if the *family relationship* began during the child's minority . . . ." (Italics added.) Similarly, the Senate Committee on Judiciary reported to its session that "[t]his bill would also create in a foster child and a stepchild the same inheritance rights as in

[4] The section was adopted to address those situations, as is the usual case, where the custodial parent remarries. The stepparent takes the children into the home, raising them as his or her own, but is refused the right to adopt by the noncustodial natural parent.

[5] Our conclusion is buttressed by the revision committee's explanation of section 26, defining "child": "Although under section 26 a stepchild or foster child is not included within the meaning of 'child' only on the basis of that relationship, a stepchild or foster child may be included if the relationship began during the person's minority . . . ." (Cal. Law Revision Com. Rep. to the Sen. Com. on the Judiciary in explanation of the proposed bill, dated June 15, 1983.)

an adopted child if the *family relationship* began during the child's minority . . . ." (Italics added.)

By analogy, we note the provisions of section 6408.5, which further define the parent and child relationship of an adopted child and its natural and adoptive parents. In delineating those situations where the child may inherit from both the natural and the adoptive parents, the operative issue is whether the "natural parent and the adopted person *lived together* at any time as parent and child . . . ." (§ 6408.5, subd. (a)(1), italics added.)

Most important, the categories of foster children and stepchildren are dealt with in the same section and receive identical treatment. In both instances, the "relationship" must originate during the child's minority and continue throughout the parties' lifetimes. It would be anomalous to find less of a "family relationship" required for inheritance by a stepchild than by a foster child. Yet "[a] foster parent has been defined as 'one who, although not legally related to the child by direct parental blood ties, nor decreed a parent in formal adoption proceedings, assumes the role of parent.' [Citations.]" (*In re Lynna B.* (1979) 92 Cal.App.3d 682, 696 [155 Cal.Rptr. 256].) They are essentially "de facto" parents. (*In re B.G.* (1974) 11 Cal.3d 679, 693 [114 Cal.Rptr. 444, 523 P.2d 244].) We do not perceive the Legislature as requiring less familial or parental involvement by a stepparent where the stepchild seeks to inherit after the death of the stepparent.

■ We are convinced the relationship envisioned by the Law Revision Commission, as framers of the revised code, and the Legislature, which enacted the proposals as amended, embraced the terms pronounced by the trial court. Distribution of the estate of one dying without a will to his or her unadopted stepchild rather than to heirs claiming by blood relationship is not automatic and must be based on a review of each situation. Where the child has lived with one natural parent rather than the other natural parent and the stepparent, any alleged relationship is necessarily more difficult to establish.

Here, the jury found there existed no family relationship like that of a parent and child between Bessie and either Thomas or Janet. The sufficiency of the evidence to support this finding is not contested. And because we find no reason to disagree with the court's instructions to the jury, we find no error.[6]

---

[6]We further note that Thomas and Janet do not contest the jury's finding there was not clear and convincing evidence that Bessie would have adopted them if the mother had consented. Thus, even were we to strike the word "family" from the instructions, the second requirement for allowing them to inherit is unfulfilled.

Judgment affirmed. Respondent to receive costs.

Scoville, P. J., and Wallin, J., concurred.