[No. H009446. Sixth Dist. Dec. 10, 1992.]

Estate of HELENA STEVENSON, Deceased.
LINDA JACKSON et al., Petitioners and Appellants, v.
JAMES C. STEVENSON, JR., et al., Claimants and Respondents.

**COUNSEL**

Douglas W. Oldfield for Petitioners and Appellants.

Fox & Berry and Dennis W. Fox for Claimants and Respondents.

**OPINION**

ELIA, J.—Respondents sought to share in Helena Stevenson's (Helen) estate. (Prob. Code, § 6408, subd. (e).)[1] Appellants contested respondents' inheritance rights. After a court trial, judgment was entered for respondents. For reasons we shall explain, we affirm.

---

[1]All further unspecified statutory references are to the Probate Code.

## Facts and Procedural Background

Respondents are Helen's stepchildren. Appellants are Helen's natural children and grandchildren.[2] When Helen died intestate in May 1990, respondents sought to share in her estate. Their claim was based upon section 6408, subdivision (e).

Section 6408, subdivision (e) permits a stepchild or foster child to inherit if certain conditions are met. In particular, section 6408 provides, "For the purpose of determining intestate succession by a person or his or her descendants from or through a foster parent or stepparent, the relationship of parent and child exists between that person and his or her foster parent or stepparent if (1) the relationship began during the person's minority and continued throughout the parties' joint lifetimes and (2) it is established by clear and convincing evidence that the foster parent or stepparent would have adopted the person but for a legal barrier."[3]

During the court trial, respondents tried to prove that section 6408 applied. Appellants argued that the statutory requirements were not satisfied. The evidence revealed the following.

In 1950, James Stevenson married Coreatha Stevenson. Respondent James Jr. was born in 1950. Respondent Thomas was born in 1951. In 1953 or 1954, James and Coreatha separated. Coreatha, who was pregnant, moved to Oklahoma. Respondents remained with James.

James began living with Helen. From 1953 or 1954 until approximately 1959, James, Helen, and respondents lived together. Helen's two children, appellant Linda Jackson and David Allen, also resided within this household.

In approximately 1959, Helen and James separated. Helen and her two children moved to Oklahoma. Respondents remained with James.

When Helen's son died, he left appellant Harvey Darnell Blackburn as his only issue.

In approximately 1960, James married Durell Stevenson. During this marriage, respondents considered Durell to be their stepmother. They believed Helen was their mother. In the early 1960's, James divorced Durell.

---

[2] James C. Stevenson, Jr., and Thomas Stevenson are respondents. Linda Jackson and Harvey Blackburn are appellants.

[3] After Helen died, subdivision (b) of section 6408 was changed to subdivision (e). (Stats. 1990, ch. 79 (Assem. Bill No. 759), § 14, eff. July 1, 1991.)

Shortly thereafter, James was assigned to Japan as part of his active duty with the United States Army. Before taking respondents to Japan, James visited Helen and Linda in Oklahoma. Respondents were present during this visit.

In 1965 or 1966, James returned from Japan to Seaside, California. He lived in Seaside with respondents and his younger brother, Otis Stevenson. Several months later, Helen moved to Seaside. She began living with James. The household consisted of James, Helen, Otis, and respondents.

In 1967, when James was assigned to Vietnam, he considered the care of his sons. James wanted Helen to adopt respondents. Before James left for Vietnam, he spoke with Coreatha on the telephone. James told Coreatha that Helen wanted to adopt respondents. He asked for her consent. Coreatha refused to agree, stating, "She [Helen] stole my husband and my kids away from me."

While James was stationed in Vietnam, respondents lived with Helen in Seaside, California. This living arrangement continued after James returned from Vietnam. Helen and James remained together until James's death in 1983.

When James died, his separate property was devised to his four children, as well as to his stepdaughter and stepgrandson, appellants herein.[4] The bulk of his estate was distributed to Helen.

When respondents were in their 30's, they discovered that Helen was not their natural mother. Nonetheless, their relationship with Helen continued until the time of her death in 1990.

Helen died intestate. Respondents petitioned to share in her estate. After a court trial, judgment was entered in their favor.

In its statement of decision, the trial court found that: "1. There was a parent-child (whether stepparent-stepchild or foster parent-foster child) relationship established between [Helen] and [respondents]; [¶] 2. This relationship was established and then reestablished during the minority of the [respondents] and continued thereafter during [Helen's] lifetime; [¶] 3. There was clear and convincing evidence that [Helen] would have adopted [respondents] while they were minors, but for the refusal of the natural mother to consent to the adoption, and; [¶] 4. The refusal of the natural mother constituted a legal barrier to the adoption."

[4]Besides respondents, James had two other children. He fathered a child with Coreatha. He also fathered a child with another woman.

For these reasons, the trial court ordered that respondents were entitled to share in Helen's estate.

*Standard of Review*

■ "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, p. 276.)

■ In reviewing a challenge to the sufficiency of the evidence, we are bound by the substantial evidence rule. All factual matters must be viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

*Discussion*

Appellants contest respondents' right to share in Helen's estate. They argue the trial court misinterpreted section 6408. For reasons we shall explain, we disagree.

Section 6408 permits a child to inherit from a stepparent if four requirements are met.[5] First, the parent-child relationship must begin during the child's minority. Second, the parent-child relationship must continue throughout the parties' joint lifetimes. Third, it must be established by clear and convincing evidence that the stepparent would have adopted the person. Fourth, it must be established by clear and convincing evidence that the stepparent would have adopted the person *but for a legal barrier*. (§ 6408, subd. (e); see also *Estate of Lind* (1989) 209 Cal.App.3d 1424, 1433 [257 Cal.Rptr. 853].)

Having examined the elements of section 6408, we next consider whether those elements were established in the present case.

A. *Relationship Commenced During Child's Minority*

Section 6408 requires that the parent-child relationship begin during the child's minority. Respondents' relationship with Helen began in 1953 or

---

[5]Although the parties seem to agree that Helen and James did marry, there is no evidence in the record to establish when the marriage took place. In its ruling, the trial court characterized Helen's relationship with respondents as that of a stepparent or foster parent. For ease of reference, we shall simply refer to Helen as respondents' stepparent.

1954. Respondents were born in 1950 and 1951. Thus, respondents were toddlers when their relationship with Helen commenced. Accordingly, it is clear that the relationship began during respondents' minority.

B.  *Relationship Continued Throughout Parties' Joint Lifetime*

Section 6408 requires that the relationship continue throughout the parties' joint lifetimes. Appellants emphasize that James and Helen separated. From 1959 until approximately 1966, James and Helen lived apart. In 1960, James married Durell. James and Helen did not resume their relationship until 1966. For these reasons, appellants argue that respondents' relationship with Helen was not continuous.

■ We must interpret the statutory language. In so doing, we must ascertain the intent of the Legislature. (Code Civ. Proc., § 1859; *Sher* v. *Leiderman* (1986) 181 Cal.App.3d 867, 881 [226 Cal.Rptr. 698].) We must be careful "not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858.) "The judiciary has no power to rewrite plain statutory language." (*Hyland Therapeutics* v. *Superior Court* (1985) 175 Cal.App.3d 509, 514 [220 Cal.Rptr. 590].) "When the meaning is plain, we apply it." (*Greyhound Lines, Inc.* v. *County of Santa Clara* (1986) 187 Cal.App.3d 480, 487 [231 Cal.Rptr. 702].)

■ Does a continuous relationship require that the parties continuously live together? If the stepparent separates from the natural parent and the child remains with the natural parent, is the child *automatically* precluded from inheriting from the stepparent? Although appellants answer this question affirmatively, we do not.

First, section 6408 does not expressly require continuity in living arrangements as a prerequisite for a continuous relationship. If the Legislature had so intended, it could have so stated. As drafted, section 6408 simply requires a "continued" relationship.

Second, there are good reasons why a stepparent's separation from the natural parent should not *automatically* prevent the child from inheriting from the stepparent. For example, the separation could be extremely brief. Or the separation could be lengthy but the stepparent could continue a close relationship with the child, even though the relationship would not be conducted within the same household. This is especially likely given the fluid state of today's family units. Given the frequency of separation and divorce, it makes sense to recognize that relationships between stepparent and child may continue to flourish even though the relationship between the stepparent and natural parent does not.

In addition, even if the relationship between the stepparent and child does not flourish during the separation, the length of the time spent together may outweigh the fact that the relationship was temporarily interrupted. In this case, respondents' relationship with Helen spanned over 35 years. A 35-year relationship which is interrupted for several years is certainly as strong as, for example, an uninterrupted 15-year relationship. In short, the type of "bright-line" rule advocated by appellants would be unnecessarily harsh and could lead to unfair results.

Third, section 6408 refers to a relationship which continues "throughout the parties' joint lifetime." This indicates that the relationship should continue past the child's minority. Since most children leave the family home when they reach adulthood, a relationship which lasts "throughout the parties' joint lifetime" would not seem to require a relationship where the parties continuously reside together.

*Estate of Claffey* (1989) 209 Cal.App.3d 254 [257 Cal.Rptr. 197] also assists our analysis. *Claffey* suggests that section 6408 contemplates a "family" relationship. Although *Claffey* indicates that such a relationship is more *easily* established if the parties are residing together, *Claffey* does not preclude the possibility of establishing the relationship in the absence of such a living arrangement.

In *Claffey,* the jury instructions described the relationship defined in section 6408 as a "family" relationship. The stepchildren, who had never lived with their stepparent, objected to this characterization. In deciding that the term "family" was properly utilized, the court noted that "the necessary 'relationship,' existing during minority and continuing throughout the parties' lifetime, must encompass something more than an exchange of wedding vows between the natural father and a stranger." (*Estate of Claffey, supra,* 209 Cal.App.3d at p. 258.)

The *Claffey* court reasoned, "We are convinced the relationship envisioned by the Law Revision Commission, as framers of the revised code, and the Legislature, which enacted the proposals as amended, embraced the terms pronounced by the trial court. Distribution of the estate of one dying without a will to his or her unadopted stepchild rather than to heirs claiming by blood relationship is not automatic and *must be based on a review of each situation. Where the child has lived with one natural parent rather than the other natural parent and the stepparent, any alleged relationship is necessarily more difficult to establish.*" (209 Cal.App.3d at p. 259, italics added.)

We agree that a continuous relationship between stepparent and child means something more than "an exchange of wedding vows between the

natural [parent] and a stranger . . . ." (*Estate of Claffey, supra,* 209 Cal.App.3d at p. 258.) However, we also believe that a continuous relationship between stepparent and child may include something less than a continuous living arrangement. In other words, the relationship between stepparent and child should not be deemed to automatically cease simply because the natural parent and the stepparent separate.

*Claffey* emphasized the importance of establishing a "family" relationship. It also stressed reviewing each situation to determine whether such a relationship exists. We agree. Courts should consider the totality of the circumstances to determine whether the relationship satisfies the statutory criteria. If the totality of the circumstances suggests a continuing family relationship, then this aspect of section 6408 is met. The stability of the parties' living arrangements, while obviously relevant, should not be the only factor considered.

■ In this case, we believe the totality of the circumstances indicates a continuous relationship between Helen and respondents. Helen and James met in the early 1950's. They remained together until approximately 1959, when they separated. During the time that respondents and Helen were separated, respondents still believed Helen was their mother. In the early 1960's, James and respondents visited Helen in Oklahoma. Several years later, in 1966, Helen and James resumed living together. Shortly thereafter, James was sent to Vietnam. Helen cared for respondents while James was away. When James returned, the family resumed living together. Helen and James remained together until 1983, when James died.

Respondents' relationship with Helen continued until her death in 1990. The evidence established that Helen considered respondents to be her sons. Likewise, respondents considered Helen to be their mother. In fact, respondents did not realize that Helen was *not* their mother until they were in their 30's. Although Helen and respondents spent seven years apart, the relationship spanned a period covering more than thirty-five years. If the relationship had commenced in 1966, instead of 1953 or 1954, there is no question that the "continued" aspect of the statute would have been satisfied. We do not believe it would be fair to prohibit respondents from inheriting solely because of the seven-year separation.

Accordingly, we believe these circumstances demonstrate that respondents and Helen had the type of continued family relationship that is contemplated by section 6408.

C. *Parent Would Have Adopted the Child*

■ Section 6408 requires "clear and convincing evidence that the . . . stepparent would have adopted the person . . . ." (§ 6408, subd. (e); *Estate*

*of Lind, supra,* 209 Cal.App.3d at p. 1433.) Appellants argue that there was insufficient evidence of Helen's intent to adopt. They claim the evidence was inadmissible hearsay. They also emphasize that Karen Spencer, Helen's friend, testified that Helen did not intend to adopt respondents because James never agreed to adopt Helen's natural children. For reasons we shall explain, we conclude this argument is without merit.

With respect to Spencer's testimony, the trial court was not required to believe it. ■ On appeal, we simply determine whether any substantial evidence supports the trial court's finding. "[A] 'reviewing court is without power to substitute its deductions for those of the trial court.' " (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) ■ If there is evidence that Helen intended to adopt respondents, then Spencer's testimony can be disregarded.

We first examine the evidence of Helen's intent to adopt. Otis testified that Helen was present when James discussed adoption. Otis, who was also present during the conversation, testified that Helen's words and/or her actions convinced him that she had agreed to the adoption. Otis explained "it was totally that she was proud of those boys. I mean she treated them like her sons." Otis also testified that James told Otis that "they were in the process of doing an adoption with Helen and—adopting the boys. . . ." Otis stated that James told him that Coreatha would not agree to the adoption.

In addition, Coreatha testified that she spoke with James about the adoption. Coreatha stated that she told James that Helen could not adopt the children because Helen had "stole my husband and my kids away from me."

From this evidence, the trial court could have concluded that Helen intended to adopt respondents. ■ Moreover, the evidence was properly admitted. This is because the statements were not offered to prove the truth of the matter asserted; the statements were offered as circumstantial evidence that Helen had agreed to adopt respondents. (See e.g. *Skelly* v. *Richman* (1970) 10 Cal.App.3d 844, 858 [89 Cal.Rptr. 556]; 1 Witkin, Cal. Evidence (3d ed. 1986) § 593, p. 566.) ■ In addition, statements regarding family history constitute an exception to the hearsay rule. (Evid. Code, § 1310.) For these reasons, we conclude that there was substantial evidence that Helen intended to adopt respondents.

D. *Child Would Have Been Adopted but for Legal Barrier*

■ Section 6408 requires clear and convincing evidence that the stepparent "would have adopted the person *but for a legal barrier.*" (§ 6408,

subd. (e), italics added; see also *Estate of Lind, supra,* 209 Cal.App.3d 1424.) According to respondents, Helen could not adopt them because Coreatha would not give her consent. According to appellants, Coreatha's consent was not required. They argue that Coreatha abandoned respondents and therefore her consent was not necessary. (See e.g., Civ. Code, § 224.)[6] Thus, appellants claim that there was nothing to prevent Helen from adopting respondents.

Appellants did not raise this theory in the trial court. It is asserted for the first time on appeal. To justify their tardiness, appellants offer evidence of James and Coreatha's divorce decree. Incorporated within that decree is a court order enjoining Coreatha from contacting respondents. Because they just discovered this divorce decree, appellants contend their tardiness in asserting the abandonment theory should be excused.

We disagree. The availability of the abandonment theory was not dependent upon the divorce decree. There is no reason why appellants could not have asserted the abandonment theory at trial. Had appellants discovered that abandonment by the natural mother removed any legal impediment to respondents' adoption, they could have then investigated to determine whether Coreatha's conduct satisfied the requirements of Civil Code section 224.

Appellants argue respondents misstated the applicable law. They state that respondents "led the trial court to believe that the refusal of the mother in the late 1960's would have automatically precluded the adoption. Respondents never disclosed the limitation set forth in Section 224 which allowed the custodial father alone to consent to the adoption." If respondents misstated the law below, then appellants should have corrected the mistake. It is more likely that both parties were unaware of the abandonment theory.[7] In any event, the failure to discover the theory does not mean appellants can rely upon it now. There was ample opportunity for appellants to raise this theory below. Having failed to do so, it is too late for them to assert it on appeal.

■ "Where the parties try the case on the assumption that a cause of action is stated, that certain issues are raised by the pleadings, that a

[6]Appellants base their abandonment theory upon Civil Code former section 224. Section 224 permitted the child to be adopted without the natural mother's consent in certain circumstances. (See *Adoption of Thevenin* (1961) 189 Cal.App.2d 245, 248 [11 Cal.Rptr. 219]; *Adoption of Easley* (1966) 240 Cal.App.2d 821, 823 [50 Cal.Rptr. 33].)

[7]Indeed, the parties probably did not know about the abandonment theory when Helen tried to adopt respondents. We do not consider the question of whether section 6408 applies when the parties mistakenly believe a legal barrier exists. As noted above, appellants did not rely upon the abandonment theory at trial and therefore we decline to consider it in this appeal.

particular issue is controlling, or that other steps affecting the course of the trial are correct, neither party can change this theory for purposes of review on appeal." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 316, p. 327.)

"A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].)

■ This case was tried upon a particular theory. The theory was that Coreatha's refusal to consent to the adoption was the legal barrier that prevented Helen from adopting respondents. The testimony of the witnesses was elicited with this strategy in mind. Direct examination and cross-examination were conducted to conform to this theory. It would not be fair to permit appellants to switch strategies at this late point. In any event, even if we considered the abandonment theory, it is unlikely that the evidence below would support it since the parties were not attempting to elicit testimony on the subject. Accordingly, we conclude that the abandonment theory was waived.

■ Appellants' next argument is that Coreatha's refusal to consent was not actually a legal barrier to respondents' adoption. This is because Coreatha's consent was not required once respondents reached adulthood. (See Civ. Code, §§ 221, 227p (both sections repealed effective July 1, 1991).) Since Helen did not take any steps to adopt respondents once they were adults, appellants contend respondents failed to establish that a legal barrier prevented the adoption.

We must interpret section 6408 to determine what "legal barrier" means. Must the legal barrier exist until the time of death? Must it simply exist at some point? For reasons we shall explain, we conclude that the legal barrier does not have to exist at all times for section 6408 to apply.

Section 6408 was examined in *Estate of Lind*, *supra*, 209 Cal.App.3d 1424. In that case, the court explained, "However, in the context of the instant case, we note that clear and convincing evidence of an attempt at adoption could be taken by a probate court as proof of the 'would have adopted' element of [section 6408]. . . . [¶] If an attempt to legally adopt was made, it can be inferred it failed because of a legal barrier, absent evidence the attempt was aborted for nonlegal reasons (such as change of heart, lack of funds, or mere lethargy), provided a *definite legal barrier can be shown to have existed at the time of attempted adoption*." (*Id.* at p. 1436, italics added.)

The court further explained that the term "legal barrier" "should be interpreted broadly in the spirit of the policy that calls for a liberal interpretation of adoption laws in the best interests of the adopted person. [Citation.]" (*Estate of Lind, supra,* 209 Cal.App.3d at p. 1436.)

*Lind* suggests that the legal barrier must exist when adoption was attempted. We agree. So long as the circumstances demonstrate that the parent wanted to adopt the child but was prevented by a legal barrier, then we believe the statutory requirements are met. Despite appellants' arguments to the contrary, we do *not* conclude that section 6408 is satisfied so long as the legal barrier exists at any time, even momentarily. Instead, it must appear that the legal barrier existed when the parties attempted adoption. It is not necessary that the legal barrier exist until the time the stepparent dies.

There are several reasons for our conclusion. First, once the child reaches adulthood, the parties may decide that adopting the child is not so important.

Second, appellants' interpretation would mean the statute would not apply to adult stepchildren. The legal barrier contemplated by section 6408 will usually be the natural parent's failure to consent. This is demonstrated by the Law Revision Comments to section 6408. The comments provide that the subdivision "applies, for example, where a foster child or stepchild is not adopted because a parent of the child refuses to consent to the adoption. . . ." Given that the legal barrier is usually the natural parent's refusal to consent to the adoption, it would not make sense to require that the legal barrier exist until the stepparent dies. If such a requirement were imposed, then section 6408 would only apply when the stepson or stepdaughter is a minor. In other words, since there would never be a legal barrier to adopting an adult, section 6408 would never permit an adult to inherit when the stepparent dies intestate. We doubt that this was the Legislature's intent in enacting section 6408.

Finally, the fact that section 6408, subdivision (e), refers to a relationship lasting "throughout the parties' joint lifetimes" suggests that the statute was meant to apply even after the child reached adulthood.

In sum, we conclude that the legal barrier need not exist through the time of the parent's death for the child to be able to inherit under section 6408. We also conclude that there was substantial evidence to support the trial court's finding that Helen would have adopted respondents but for a legal barrier.

For these reasons, the judgment is affirmed.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.