Filed 6/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| GLENN EISEN et al., | B278271 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC121338) |
| v. | |
| ARDESHIR TAVANGARIAN et al. | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig D. Karlan, Judge. Reversed and remanded with directions.

Rosario Perry Law Corp., Rosario Perry, Hiroko Ushimaru; Law Offices of Richard B. Miller and Ricahrd B. Miller for Plaintiffs and Appellants Glenn Eisen and Alison Eisen.

Judith A. Gelfand for Marquez Knolls Homeowners Judith A. Gelfand, Wayne Marcus, Bernard Hathaway, William R. Fado, H. Peter Grassl, Kathleen A. Kerrigan, Silgia Grassl, Emil Kadrnka, Simon T. Halff, Brian Faris, Peter J.

Zomber, Sabrina Diaz and Renate Hecht as Amici Curiae on behalf of Plaintiffs and Appellants Glenn Eisen and Alison Eisen.

Horvitz & Levy, Barry R. Levy, John A. Taylor, Jr., Andrea M. Gauthier; Afifi Law Group and Faryan Andrew Afifi for Defendants and Appellants Ardeshir Tavangarian, Tania Tavangarian and 619 Properties, LLC.

_____

Following a bench trial the court entered judgment and granted an injunction in favor of Glenn Eisen and Alison Eisen, finding that Ardeshir Tavangarian, Tania Tavangarian and 619 Properties, LLC had violated the view protection provisions of paragraphs 1 and 11 of the covenants, conditions and restrictions (CC&R's) applicable to the parties' neighboring properties in the Marquez Knolls section of the Pacific Palisades. The court ordered removal of certain alterations and improvements made by the Tavangarians to their home, now owned by 619 Properties, and awarded the Eisens $39,000 in "interim damages" for their loss of view.

On appeal the Tavangarians and 619 Properties argue neither paragraph 1 nor paragraph 11 of the CC&R's restricts alterations to an existing residence; the Eisens waived or are estopped from seeking relief with respect to several claims in their lawsuit; injunctive relief was improperly awarded in view of the adequacy of the Eisens' legal remedy and the balance of equities; and the court erred in excluding relevant evidence and denying a request for leave to amend their answer. In a limited cross-appeal the Eisens contend the trial court erred in ruling paragraph 1 of the CC&R's prohibits only alterations of a residence's second story that detract from a neighbor's view and

2

not all expansions of the contour or silhouette of a previously approved second story.

We reverse the judgment with directions.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Parties*

The Eisens purchased the real property located at 1145 Lachman Lane in the Marquez Knolls area of Pacific Palisades in August 2009. The Tavangarians, as trustees of the Tavangarian Revocable Trust dated 2002, purchased the real property at 1134 Lachman Lane in October 2012 for the purpose of remodel and resale.[1] The Tavangarians never lived at 1134 Lachman Lane and sold the property to 619 Properties in April 2014 during the pendency of this litigation.

Lachman Lane generally runs north-south. The Tavangarian property is across the street, to the southeast of the Eisen property. Both homes have ocean views to the south. However, based on two site inspections, the trial court found the Eisens' primary view is out their east-facing windows across Lachman Lane and over the roof of the Tavangarians' home.

2. *The CC&R's Governing Lots in Marquez Knolls Tract 20305*

Homes in the Marquez Knolls area were originally constructed as 2,200-to-2,500-square-foot tract houses with common architectural and design features. The Eisen and Tavangarian properties are located in tract 20305 and are subject to CC&R's recorded for that tract on May 4, 1962. Four of the

---

[1]	Mr. Tavangarian owns a firm that designs and constructs higher-end single-family homes and hotels.

3

CC&R's—paragraphs 1, 2, 3 and 11—are particularly significant to the case at bar.

Paragraph 1 of the CC&R's provides:

"All said lots shall be known and described as residential lots, no structure shall be erected, altered, placed or permitted to remain on any building plot other than one detached single-family dwelling not to exceed one story in height and a private garage, for not more than three cars; except; where, in the judgement [*sic*] of the Declarant [(Marquez Knolls Inc.)[2]] and approved by the Architectural Committee, one two story single-family dwelling may be erected where said dwelling will not detract from the view of any other lot."

Paragraph 2 provides in part:

"No building shall be erected, placed or altered on any building plot in this subdivision until the building plans, specifications, and plot plan showing the location of such building have been approved in writing as to the conformity and harmony of exterior design with existing structures in the subdivision, and as to location of the building with respect to topography and finished ground elevation by an Architectural Committee . . . .  In the event the said committee fails to approve or disapprove a design and location within thirty (30) days after said plans and specifications have been submitted to it, or in any event, if no suit to enjoin the erection of said such building or making of any alterations have [*sic*] been commenced prior to the completion thereof, such approval will not be

---

[2]     The CC&R's were signed by Melvin Lachman, president, and Earl Lachman, secretary, on behalf of the developer and declarant, Marquez Knolls Inc.  In places the CC&R's refer to "Declarants" in the plural.

4

required and this covenant will be deemed to have been fully complied with. . . . The power and duties of such committee shall cease on or after December 31, 1966. Thereafter, the power and duties described in this covenant shall pass to the Marquez Knolls Property Owner's Association, Inc., a California corporation, who shall thereafter exercise the same powers previously exercised by said committee until December 31, 1980 at such time the powers and duties exercised by said Association shall cease and determine."

Paragraph 3 provides:

"No building shall be located on any lot nearer than fifteen (15) feet to the front lot line.  No building, except a detached garage or other outbuilding located sixty (60) feet from the front lot line, shall be located nearer than five (5) feet to any side line.  No residence or attached appurtenance shall be erected on any lot nearer than fifteen (15) feet from the front lot line except where the county or city permits and with specific authority of the architectural committee."

Paragraph 11 provides:

"No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot, and the right of entry is reserved by the Declarants to trim any tree obstructing the view of any lot."

3. *The Tavangarians' Remodel of Their Home*

When the Tavangarians purchased 1134 Lachman Lane, the house had an L-shaped design.  The rectangular portion lying east-west had two stories and was located at the north end of,

and perpendicular to, the one-story portion of the house that ran north-south at the western end of the east-west segment. The Eisens and the Tavangarians agree the architectural committee had approved the two-story residence at the time it was built, as required by paragraphs 1 and 2 of the CC&R's.

Starting in approximately April 2013 Mr. Tavangarian began remodeling the residence. He replaced an old rooftop air-conditioning unit with new air-conditioning units, ducts, fences and related modifications on the first- and second-story roofs. The second story's western wall was extended to the south by more than five feet (referred to as a "privacy wall"), and its south-facing wall was extended to the south by more than four feet. In addition, the original roof of the second story was extended by cantilevering it out to the south by eight feet, so that it was coextensive with the new privacy wall. Tavangarian also built a three-sided glass wall enclosure that extended a second-floor bathroom several feet to the south; and he extended the east-facing side of the second story by approximately two feet, from which he built a deck with a cantilevered roof covering it. Finally, existing hedges along the border of the property at Lachman Lane were removed and replaced. The new hedges were permitted to grow more than three feet above the ground.

By the end of September 2013 the project was nearing completion, and the air-conditioning equipment was in place.

4. *The Eisens' Lawsuit*

The Eisens sued the Tavangarians on September 13, 2013, alleging the remodeling being done at the Tavangarians' property violated paragraphs 1 and 11 of the CC&R's, which the Eisens alleged "prohibit the erection of any 'structures' that would unreasonably obstruct or detract from" the view from their

6

property. More precisely, the Eisens alleged paragraph 1 prohibits a property owner from making any alterations to an existing two-story structure and paragraph 11 prohibits a property owner from erecting a structure that unreasonably obstructs the view from any other lot. The complaint specifically identified the new "Multi-Ton Air Conditioner" and related ducting and equipment on the first- and second-story roofs and alleged the Eisens were concerned the Tavangarians "may be planning to construct other or additional structures, in addition to the air-conditioner and ducting that would obstruct their views in violation of the CC&Rs." The Eisens' complaint sought damages and injunctive relief, including an injunction preventing the Tavangarians from making any additions or alterations that raised or increased their house's original roof height.

The Eisens filed a first amended complaint in February 2014 and a second amended complaint in June 2014, which added 1134 Lachman Lane's new owner, 619 Properties, as a defendant. Neither amended version of the pleading specifically addressed the privacy wall, the cantilevered roof or the glass enclosure that was being constructed at the property. However, in a trial brief filed in August 2015 and subsequent papers filed by the Eisens during the bench trial, these items were raised as additional violations of paragraphs 1 and 11 of the CC&R's.

5. *Trial and the Trial Court's Decision*

The Eisens' lawsuit was tried to the court in late 2015 and early 2016. In addition to oral and documentary evidence, the court made two site visits to the Eisens' and Tavangarians'

7

properties in February 2016.  The court filed its statement of decision on June 23, 2016.[3]

After finding that the tract 20305 CC&R's were binding and sufficiently certain to allow specific performance and damages, the court explained that all parties had agreed for purposes of trial that this court's decision in *Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618 (*Zabrucky*) applied to the alterations to the one-story section of the home on the Tavangarians' property.  *Zabrucky*, examining the CC&R's of a neighboring tract in Marquez Knolls that were essentially identical to the CC&R's at issue here, held paragraph 11 applied not only to construction of a new, free-standing structure on the property but also to any alteration or remodeling of an existing dwelling (or, at least, to one-story residences) and, with respect to both categories, prohibited any structure that "may at present or in the future unreasonably obstruct the view from any other lot."  But, the trial court emphasized, the parties disagreed as to the applicable standard for modifications to the two-story section of the Tavangarians' house.

Quoting from paragraph 1 of the CC&R's, which permitted erection of a two-story residence if approved by Marquez Knolls Inc. and the architectural committee "where said dwelling will not detract from the view of any other lot," the court identified four possible interpretations of the CC&R's impact on two-story residences in light of the fact the architectural committee no longer existed and the delegation of its power to the

---

[3]     The court explained that 619 Properties, joined as a defendant after it had purchased the Tavangarians' property, did not participate in the trial but agreed to be bound by the court's ruling.

8

property owners association had terminated as of December 31, 1980:  (1) the exterior of a previously approved two-story residence cannot be altered; (2) a home can be rebuilt or its exterior remodeled, but any changes must conform exactly to the footprint of the previously approved structure; (3) a home can be rebuilt or its exterior remodeled only if the changes do not detract from the view of any other lot; and (4) a home can be rebuilt or its exterior remodeled if the changes do not unreasonably obstruct the view from any other lot (that is, applying the *Zabrucky* majority's interpretation of paragraph 11 to both first- and second-story alterations).  The court stated the Eisens urged adoption of interpretation 2 and the Tavangarians argued for interpretation 4; however, the Tavangarians proposed, if the court were to adopt interpretation 3, it added the word "unreasonably" in front of the word "detract" for the same reasons the *Zabrucky* majority had inserted the word "unreasonably" in paragraph 11.

The court adopted interpretation 3 without adding "unreasonably":  "[T]he Court finds as to the legal significance of Paragraph 1 that it only prohibits expansion of the Declarant and Architectural Committee's approved envelope of the second story structure where said expansion would not detract from the view from any other lot."  The court explained that interpretation 2, advocated by the Eisens, while reasonable, would preclude any construction of a two-story home where a one-story residence currently existed, even if the construction or remodeling would not detract from the view from any other lot.  The policy favoring free use of land weighed against that restrictive interpretation. To adopt interpretation 4, the court reasoned, would require it to find that paragraph 1 no longer applied to homes in tract 20305

9

in the absence of an architectural review committee. The court concluded the intent of the drafters of the CC&R's was to provide greater view protection from two-story homes than from one-story residences, as evidenced by the use of "detract" in paragraph 1 but "obstruct" in paragraph 11; and it "sees no reason to grant less protection today with respect to views impacted by two story dwellings now that all lots have been built and the reviewing committee disbanded." The court declined to include "unreasonably" in front of "detract" because that word was not in paragraph 1 as drafted "and to add it now would only create greater confusion in interpreting and applying this standard."

Applying its interpretation of the CC&R's to the questions whether the Tavangarians' first-story improvements "unreasonably obstruct" the views from the Eisens' property and whether the second-story improvements "detract" from the Eisens' views, the court found most of the remodeling violated the CC&R's. Specifically, the court found the privacy wall and the cantilevered roof on the south-facing side of the residence detracted from the Eisens' view in violation of paragraph 1 and also unreasonably obstructed their view in violation of paragraph 11. Both were ordered removed. The court retained jurisdiction to address the removal or modification of the second-floor bathroom glass wall extension; it explained that extension might detract from the Eisens' view once the privacy wall and cantilevered roof were removed, but the court was not yet able to make that determination.[4]

---

[4]    The court found the Eisens did not prove the eastern extension of the cantilevered roof unreasonably obstructed or detracted from their view.

With respect to the air-conditioning ducts and related equipment, the court found the items on the first-story roof unreasonably obstructed the Eisens' views and those on the second-story roof detracted from their views. They were ordered replaced with significantly less obtrusive equipment.

Finally, the court found the hedges planted by the Tavangarians violated paragraph 11 of the CC&R's, rejecting the contention the Eisens had agreed to allow the hedges to grow to the roof line of the property or had waived their right to enforce the three-foot height limit on hedges in paragraph 11. The court also awarded $39,000 as interim damages for loss of view for the period from the filing of the lawsuit until the last day of trial.

In finding in favor of the Eisens, the court rejected the Tavangarians' affirmative defenses of waiver and estoppel, predicated on the Eisens' delay in objecting to anything other than the new air-conditioning units and related equipment, noting that the Eisens had filed their lawsuit challenging the remodeling of the Tavangarians' home within a matter of months of the beginning of construction. Because the Tavangarians had not discussed their remodeling plans with the Eisens, the court found it reasonable that the Eisens were unable to determine from wooden framing placed during the summer of 2013 how extensive the view intrusion would be. In addition, with respect to the Tavangarians' assertion the Eisens had not objected to the height of the new hedges on the Tavangarians' property, the court found that the Eisens had asked the prior owners, "on several occasions, to trim the hedges and . . . the hedges were trimmed from time to time." Thus, the court found the Tavangarians had not carried their burden of proving the Eisens

11

had agreed to any height above the three-foot limit in the CC&R's.[5]

On August 9, 2016 the court entered its judgment and injunction after bench trial, retaining its jurisdiction, as described in the statement of decision, to enforce the injunction, including resolution of any disputes that might arise under it.

## DISCUSSION

1. *Standard of Review*

"CC&R's are interpreted according to the usual rules of interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties. [Citations.] Where, as here, the trial court's interpretation of the CC&R's does not turn on the credibility of extrinsic evidence, we independently interpret the meaning of the written instrument." (*Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817; accord, *Bear Creek Master Assn. v. Southern California Investors, Inc.* (2018) 28 Cal.App.5th 809, 818; see *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1123 ["[w]e review the interpretation of the CC&R's de novo"].)

Under California law a landowner has no right to an unobstructed view over adjoining property, and "'the law is reluctant to imply such a right.'" (*Boxer v. City of Beverly Hills* (2016) 246 Cal.App.4th 1212, 1219; accord, *Pacifica Homeowners'*

---

[5] At trial the Tavangarians also raised an in pari delicto defense and attempted to introduce evidence the Eisens' property violated the CC&R's. Although the defense had been asserted in their answer to the second amended complaint, it was omitted in a later-filed amendment to that answer. The court ruled the defense was untimely and excluded the evidence.

*Assn. v. Wesley Palms Retirement Community* (1986)
178 Cal.App.3d 1147, 1152.) Although such a right may be
created through adoption of enforceable CC&R's (see, e.g., *Posey
v. Leavitt* (1991) 229 Cal.App.3d 1236, 1250), "[i]t is a general
rule that restrictive covenants are construed strictly against the
person seeking to enforce them, and any doubt will be resolved in
favor of the free use of land." (*White v. Dorfman* (1981)
116 Cal.App.3d 892, 897 (*White*); accord, *Chee v. Amanda Goldt
Property Management* (2006) 143 Cal.App.4th 1360, 1377; see
generally 6 Miller & Starr, Cal. Real Estate (4th ed. 2018)
§ 16:17, p. 16-73 ["restrictive covenants are to be construed
strictly against limitations upon the free use of property, and
where a provision is subject to more than one interpretation, the
construction that is consonant with the unencumbered use of the
property will be adopted"].) That said, it is also "our duty to
interpret the deed restriction 'in a way that is both reasonable
and carries out the intended purpose of the contract.'" (*Alfaro v.
Community Housing Improvement System & Planning Assn., Inc.*
(2009) 171 Cal.App.4th 1356, 1378; see *Ezer v. Fuchsloch* (1979)
99 Cal.App.3d 849, 861; see also 6 Miller & Starr, *supra*, § 16:17
at p. 16-75 ["[i]n the absence of ambiguity, the fair intent of the
parties is enforced"].)

    2. *The Propriety of Revisiting* <u>*Zabrucky*</u>

    The trial court grounded its interpretation of the CC&R's
potentially applicable to the Tavangarians' renovations of the
house at 1134 Lachman Lane on this court's divided decision in
*Zabrucky*, *supra*, 129 Cal.App.4th 618, which, as discussed, held
paragraph 11 of the Marquez Knolls CC&R's prohibited any
remodeling or alteration of an existing residence that "may at
present or in the future <u>unreasonably</u> obstruct the view from any

13

other lot." (*Id*. at p. 629 [adding, with underlining, the word "unreasonably" to the text of the CC&R's].)[6] Based on that interpretation of the view protection provided by paragraph 11, the trial court ruled that paragraph 1 afforded even greater protection to improvements that enlarged the existing second story of a residence.

The Tavangarians agreed *Zabrucky*'s interpretation of paragraph 11 was binding on the trial court, but argue on appeal we should adopt the reasoning of the *Zabrucky* dissent and hold that, unlike paragraph 2 of the CC&R's, paragraph 11 does not restrict renovating or altering existing residences. (See *Zabrucky*, *supra*, 129 Cal.App.4th at pp. 630-634 (dis. opn. of Perluss, P. J.).) With that interpretation of paragraph 11 as their premise, the Tavangarians argue paragraph 1 similarly does not restrict improvements to the second story of a residence previously approved by the architectural committee.

The Eisens insist the Tavangarians have waived any right to argue on appeal that *Zabrucky* was incorrectly decided through their "judicial admission" in the trial court that the term "structure" in paragraph 11 of the CC&R's included the homeowner's existing residence, as held by the *Zabrucky* majority. No judicial admission was made: To be considered a

---

[6]     The CC&R's for Marquez Knolls tract 26065, recorded on June 20, 1963, at issue in *Zabrucky*, and those for tract 20305, at issue in the case at bar, are identical, save only that the requirement for approval of all building and remodeling plans by the architectural committee and thereafter by the Marquez Knolls Property Owner's Association, as set forth in paragraph 2, expired on December 31, 1980 in tract 20305, but not until December 31, 1995 in tract 26065.

14

binding judicial admission, "the declaration or utterance must be one of fact and not a legal conclusion, contention, or argument." (*Stroud v. Tunzi* (2008) 160 Cal.App.4th 377, 384 ["judicial admissions involve fact, not legal theories or conclusions"]; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 709 [same].)

Moreover, as the Tavangarians emphasize, it would have been pointless to challenge that interpretation at trial. (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 ["here the trial court was bound by prior appellate decisions . . . [,] and it would therefore have been pointless to raise the issue there"]; *Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1001 [trial court must follow controlling precedent from a court of appeal]; see generally *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We, however, are free to reconsider one of our prior decisions and conclude it was mistaken. (See, e.g., *Barnett v. First National Ins. Co. of America* (2010) 184 Cal.App.4th 1454, 1460 [holding this court's decision six years earlier regarding the validity of a joint settlement offer to a husband and wife under Code of Civil Procedure section 998 "was mistaken"]; see also *Tourgeman v. Nelson & Kennard* (2014) 222 Cal.App.4th 1447, 1456, fn. 7 [a court of appeal panel is free both to disagree with decisions by other panels and to reconsider its own prior decisions]; see generally *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1180 ["[w]e respect the principle of stare decisis, but reconsideration of a poorly reasoned opinion is nevertheless appropriate"]; *Cianci v. Superior Court* (1985) 40 Cal.3d 903, 924 [although the doctrine of stare decisis serves important values, "it nevertheless should

not shield court-created error from correction"].)  While it would have been better practice for the Tavangarians to advise the trial court they might challenge the *Zabrucky* majority's interpretation of paragraph 11 on appeal, their failure to do so does not preclude this court from revisiting the issue.  (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 ["it is settled that a change in theory is permitted on appeal when 'a question of law only is presented on the facts appearing in the record'"]; *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [same]; *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341; see also *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709 [parties are permitted to raise new issues on appeal involving questions of law; "application of the forfeiture rule is not automatic; appellate courts have discretion to excuse such forfeiture"].)[7]

    3. *Neither Paragraph 1 Nor Paragraph 11 of the CC&R's Restricts Renovations or Alterations to a Previously Approved Residence; Paragraph 2, Which Did Apply to Residential Alterations, Has Long Since Expired*

In light of the principle that, if possible, we must read the CC&R's as a whole and adopt the construction that gives effect to

---

[7]    "The general rule confining the parties upon appeal to the theory advanced below is based on the rationale that the opposing party should not be required to defend for the first time on appeal against a new theory that 'contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at trial.'"  (*Ward v. Taggart*, *supra*, 51 Cal.2d at p. 742.)  This rule does not apply here because the trial court was obligated to follow *Zabrucky*, *supra*, 129 Cal.App.4th 618 whether or not the Tavangarians indicated their disagreement with its holding.

every part of the CC&R's (see *Bear Creek Planning Committee v. Ferwerda* (2011) 193 Cal.App.4th 1178, 1183; *Ezer v. Fuchsloch*, *supra*, 99 Cal.App.3d at p. 861), the plain language of paragraph 1 is properly interpreted as defining the character of the development (residential, limited to detached single-family dwellings) and establishing basic limitations on the types of homes permitted (not to exceed one story in height, except where a two-story residence was authorized by Marquez Knolls Inc. and the architectural committee, with a private garage for not more than three cars); paragraph 2 as regulating the initial construction and subsequent alterations of a permitted single-family residence (by requiring approval of building plans by the architectural committee and, when that committee ceased to exist at the end of 1966, until December 31, 1980 by the Marquez Knolls Property Owner's Association); and paragraph 11 as controlling the height of fences, hedges, other landscaping and outbuildings other than a detached garage. This interpretation of the CC&R's not only comports with their apparent intent but also furthers the public policy in favor of the free use of land.

  a. *Paragraph 1 of the CC&R's controlled the basic size of homes in tract 20305 and did not regulate renovations or remodeling*

  Paragraph 1 restricted development in tract 20305 to single-family homes and specified that all such homes were to be one story in height except, with the approval of Marquez Knolls Inc. and the architectural committee, "one two story single-family dwelling may be erected where said dwelling will not detract from the view of any other lot." While the paragraph's basic one-story limit applied whether a residence was "erected, altered, placed or permitted to remain on any building plot," it did not

17

otherwise restrict the initial construction or renovation of a single-story residence.[8] The mechanism for determining what construction would actually be permitted within that general parameter, including renovations to, or remodeling of, a residence, was provided in paragraph 2, which required approval by the architectural committee, and then by the property owners association, for a stated period of years, of all building plans and specifications for both initial construction and any alterations to a residence. (See *Zabrucky*, *supra*, 129 Cal.App.4th at pp. 620, 624; *id.* at pp. 631, 634 (dis. opn. of Perluss, P. J.).)

As stated, initial construction of a two-story residence could only be approved if, in the judgment of Marquez Knolls Inc. and the architectural committee, it would "not detract from the view of any other lot."[9] But once a second story was approved and erected as part of the original construction of a home—construction that, pursuant to paragraph 16,[10] had to begin

---

[8]  Paragraph 3 established front- and side-yard setback lines for placement of the residence, as well as outbuildings; and paragraph 7 stated a minimum size (2,000 square feet) for the "main structure."

[9]  The CC&R's named Melvin Lachman, Marquez Knolls Inc.'s president, and Earl Lachman, its secretary, as two of the three members of the architectural committee, effectively delegating to the Lachmans in the first instance the authority to decide where two-story homes would be built in their development.

[10]  Paragraph 16 provided, "Construction of a residence as provided by said Declaration of Restrictions on any of said lots must be commenced within two (2) years from the date of the recording of the deed transferring title to said lot from Declarants

18

within two years of the individual property owner's acquisition of title from the developer—paragraph 1 played no further role. As the Eisens emphasize in their briefing in this court, unlike the first part of that paragraph, the portion of paragraph 1 dealing with two-story dwellings did not refer to subsequent alterations to the residence. That matter was also covered by paragraph 2, which did not distinguish between the approvals required for the building plans for one-story and two-story residences.

The Eisens, however, argue that paragraph 1's reference to erecting a second-story residence, but not to altering it, means, once approved, the second story of a home may not thereafter be modified in any way that enlarges its contour or silhouette. That contention contravenes two fundamental principles of construction that guide our resolution of this case. First, as discussed, if there is more than one reasonable interpretation of a restrictive covenant, it is to be construed against the individual seeking to enforce it and in favor of the free use of land. (See *Chee v. Amanda Goldt Property Management*, *supra*, 143 Cal.App.4th at p. 1377; *White*, *supra*, 116 Cal.App.3d at p. 897.) Second, because paragraph 2 by its express terms applied to any proposed alteration or renovation of a home in tract 20305, whether initially constructed as a one-story or as an approved two-story residence, to read into paragraph 1 an absolute prohibition of any modifications to a second story would fail to give full effect to paragraph 2. (See *Bear Creek Planning Committee v. Ferwerda*, *supra*, 193 Cal.App.4th at p. 1183; *Ezer*

herein unless specifically extended in writing by the Architectural Committee."

19

*v. Fuchsloch*, *supra*, 99 Cal.App.3d at p. 861.) We decline to adopt such a restrictive interpretation of paragraph 1.[11]

We reject for similar reasons the trial court's interpretation of paragraph 1 as prohibiting any remodeling of the previously approved second story of a residence unless the alterations did not detract from the view of any other lot. Whether or not paragraph 1 prohibits a homeowner from adding a story to a one-story home or to a previously approved two-story home, an issue the parties agree we need not decide, that paragraph does not address the permissible scope of other renovations or improvements to one-story or previously approved two-story residences. Whatever restrictions might apply to remodeling those homes after they had been approved and constructed were to be found, if at all, elsewhere in the CC&R's.

> b. *Approval for renovations and alterations specified in paragraph 2 was no longer required after December 31, 1980*

There can be no question that the plan-approval requirements of paragraph 2, which regulates both initial construction and renovations of residential dwellings in tract 20305 (that is, both "the erection of said such building" and "making of any alterations" to them) would apply to the Tavangarians' remodeling project if that provision were still in effect. All parties agree, as did the trial court, that paragraph 2's December 31, 1980 sunset provision means that covenant is no longer enforceable. But they disagree as to the consequences of

---

[11] As the parties acknowledge, it is unnecessary for us to decide in this case whether a single-story residence could now be remodeled to add a second story.

20

the elimination of the architectural committee as of December 31, 1966, as set forth in paragraph 2.

The Eisens, who elsewhere insist paragraph 1 strictly prohibits any alterations to an originally approved second story, when attempting to reconcile the limited tenure of the architectural committee with their absolutist position on view protection, paradoxically contend that Marquez Knolls Inc. and the architectural committee could authorize renovations or alterations to a second story—what they term an exception to paragraph 1's prohibition. Once those entities ceased to exist, they assert, there was no longer any possibility of obtaining such an exception. Hence, no alterations of the Tavangarians' second story was permissible.

But it was paragraph 2, not paragraph 1, that required review and approval of building plans and specifications by the architectural committee as a condition for making alterations to an existing residence. Paragraph 2 transferred that authority to the property owners association following elimination of the architectural committee as of December 31, 1966. After another 14 years the responsibility of the association for approving building plans ceased. Contrary to the Eisens' claim, what was eliminated as of that date was not the power to grant an exception to a prohibition on renovations, but the requirement for plan approval as a precondition for going forward with them.

Both the majority and dissenting opinions in *Zabrucky*, *supra*, 129 Cal.App.4th 618 interpreted the Marquez Knolls CC&R's to permit improvements to existing residences without preconstruction plan approval by the architectural committee or the property owners association once the sunset date in paragraph 2 had passed. (*Id.* at pp. 624, 629 [maj. opn. of

21

Woods, J.); *id.* at p. 631 [dis. opn. of Perluss, P. J.].) That interpretation is supported not only by the general policy of strictly construing restrictions on the free use of land but also by language in paragraph 2 itself, which deems the condition satisfied if the committee or association failed to approve or disapprove plans within 30 days of submission. Just as the failure of the responsible entity to act would be deemed satisfaction of the condition, the absence of an entity with the authority to review and approve building plans nullifies that requirement as a precondition to proceeding with renovations and remodeling.

This interpretation of the effect of the sunset provision in paragraph 2 is reinforced by a review of the CC&R's for two neighboring tracts in Marquez Knolls, which the Eisens have provided this court and invited us to use as interpretative aids.[12] In 1957 paragraph 2 of the CC&R's for tract 20179, which is otherwise substantially identical to paragraph 2 of the CC&R's

---

[12]    We grant the Eisens' motion to take judicial notice of items 1, 2 and 3 submitted with their motion: the CC&R's for tract 20179, recorded February 7, 1957; the amendment to that tract's CC&R's, recorded March 29, 1957; and the CC&R's for tract 26065, recorded June 20, 1963, the CC&R's at issue in *Zabrucky*, *supra*, 129 Cal.App.4th 618. (See Evid. Code, §§ 452, subd. (c), 459, subd. (a); *Cal-American Income Property Fund II v. County of Los Angeles* (1989) 208 Cal.App.3d 109, 112, fn. 2.) We deny the balance of the motion to take judicial notice and the alternative motion to augment the record. Items 5, 6, 7 and 8 are not subject to judicial notice. Item 4 is irrelevant. None of these eight documents was filed or lodged in the case in superior court; accordingly, none is properly added to the record through a motion to augment.

for tract 20305, provided that the powers and duties of the architectural committee would cease on December 31, 1960, not quite four years later.  Thereafter, the paragraph continued, "the approval described in this covenant shall not be required" unless a majority of the record owners in the subdivision appointed a representative or representatives to continue to exercise the committee's powers.

Apparently deciding it was worthwhile to continue for a longer period the plan-approval precondition to alterations or renovations to existing residences, Marquez Knolls Inc. revised paragraph 2 in the 1962 tract 20305 CC&R's at issue in this case by extending the life of the architectural committee by one year and providing for transfer of the committee's authority to the property owners association for a period of 14 years, rather than leaving to the subdivision's homeowners the decision whether to create a new entity with approval authority.  By the following year, in the CC&R's for tract 26065 (the *Zabrucky* CC&R's), the life of the architectural committee was extended by more than a dozen years (to December 31, 1980), and the transfer of authority to the association lasted an additional 15 years.  Nowhere do these revised CC&R's, with extended periods for approval of plans and specifications for alterations and renovations to existing residences, indicate an intent to prohibit remodeling a residence's first or second story after the applicable sunset period.  No such reading of the CC&R's before us would be reasonable.  (See *Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1199 [deed restrictions are to be construed in a way that is reasonable and carries out their intended purpose]; *Alfaro v. Community Housing*

23

*Improvement System & Planning Assn., Inc., supra,*
171 Cal.App.4th at p. 1378 [same].)

### c. *Paragraph 11 does not restrict renovating or altering existing residences*

The foregoing analysis leads directly to the question we previously considered in *Zabrucky*, *supra*, 129 Cal.App.4th 618: Does paragraph 11 of the CC&R's, which, after limiting the height of fences and hedges between the street and the front setback line, provides, "nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot," apply to alterations or renovations to existing homes? The majority opinion, although conceding the issue presented a "'true conundrum'" and describing its conclusion as only "marginally more logical and supportable" than the opposing view (*id.* at p. 624), reversed the trial court and answered with a modified "yes." Giving the words "any structures" what it termed their ordinary meaning and mindful of the desire of most existing Marquez Knolls homeowners to protect their views and property values (*id.* at p. 628), the majority held paragraph 11's restrictions applied to additions to, or renovations of, an existing residence. (*Ibid.*)[13] The majority added, however, that "it is not

---

[13] In reaching its conclusion the majority opinion relied on *Seligman v. Tucker* (1970) 6 Cal.App.3d 691, in which Division Five of this court affirmed an injunction requiring the defendants to remove or lower the roof of a rumpus room, which they had added to their home in a hillside portion of Sherman Oaks and which obstructed the adjoining owner's "panoramic views" of the lower San Fernando Valley. (*Id.* at p. 693.) As explained in *Zabrucky*, the restriction at issue in *Seligman*

24

reasonable to interpret the CC&R's as prohibiting any obstruction of existing views," even though that is exactly what paragraph 11 states. (*Id.* at p. 629.) Instead, the majority concluded "it would be in keeping with the intent of the drafters of the CC&R's to read into paragraph 11 a provision that the view may not be unreasonably obstructed . . . ." (*Ibid.*)

The *Zabrucky* majority misread paragraph 11. It is certainly true that the common meaning of the word "structure," considered without regard to context, includes a house and that adding rooms to a residence or expanding existing ones could be described as erecting a structure. But context and usage matter. (See *White*, *supra*, 116 Cal.App.3d at p. 898 [cautioning, while interpreting a view protection provision in CC&R's governing a portion of the Trousdale Estates section of Beverly Hills, "[t]he word 'structure' as used in the CC & Rs has various meanings depending upon the context in which it is used"].)

For purposes of properly understanding the scope of the view protections in paragraph 11, paragraph 3, mentioned only in passing in *Zabrucky*, provides a necessary backdrop. That

---

provided, "'No hedge or hedgerow or wall or fence *or building* or other structure shall be planted, erected, located or maintained upon any lot in such location or in such height as to unreasonably obstruct the view from any other lot or lots on said Tract.'" (*Zabrucky*, *supra*, 129 Cal.App.4th at p. 625.) But there was no dispute in *Seligman* that the rumpus room was a "building or other structure" that was "erected, located or maintained" on defendants' lot. The question was whether "unreasonably obstruct" was too vague or uncertain a term to be enforced by a mandatory injunction. (*Seligman*, at p. 696.) The court's analysis on that point has no bearing on the proper interpretation of paragraph 11 in the Marquez Knolls CC&R's.

25

paragraph established a general front setback ~~limit~~ minimum for any "building" and then separately specified front and side setback limits for the "residence" and for "a detached garage or other outbuilding." That is, paragraph 3 expressly contemplated homeowners in Marquez Knolls might construct not only their residence with a detached garage, as authorized by paragraph 1, but also "outbuildings": "'[a] small building appurtenant to a main building and generally separated from it; e.g. outhouse, storage shed.'" (*People v. Smith* (1994) 21 Cal.App.4th 942, 951, quoting Black's Law Dict. (5th ed. 1979) p. 993, col. 1.) Paragraph 6 similarly anticipated outbuildings might be erected on lots within the tract and prohibited their use as a residence.[14]

Recognizing that outbuildings, as well as residences, might be built on lots within tract 20305 gives meaning to the word choices reflected in paragraphs 1, 2 and 11 of the CC&R's. As discussed, when mandating a general one-story height limit, paragraph 1 refers to dwellings that are both "erected" and "altered." Similarly, paragraph 2 in requiring architectural committee approval of building plans expressly applies to "erection of said building or making any alterations." Yet paragraph 11 restricts only erecting a structure, not making alterations to one. While that language would unquestionably apply to construction of a greenhouse, storage shed or other form of outbuilding, omission in this paragraph of the word "alter" indicates that covenant does not apply to renovations or remodeling of the homeowner's residence.

---

[14] Paragraph 6 provides in full: "No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding erected on any lot, shall be at any time used as a residence, either temporarily or permanently."

Indeed, when advocating for their restrictive interpretation of paragraph 1, the Eisens have recognized the significance of Marquez Knolls Inc.'s decision to use only the verb "erect" and not also "alter" when drafting a covenant.  The Eisens emphasize that the second portion of paragraph 1, which addresses approval for the construction of a two-story residence, does not use the verb "alter"; that omission, they argue, means no remodeling is permissible:  "Under Paragraph 1 of the CC&Rs, Defendants are prohibited from altering the second story of an existing two-story dwelling, as the word 'alter' is specifically omitted from the reference to two-story dwellings to indicate that a two-story dwelling may not be altered. . . .  Pursuant to Paragraph 1 of the CC&Rs, only a one-story home may be altered."  By a parity of reasoning, because the word "alter" was "specifically omitted" from the reference to structures in paragraph 11, the restrictions in that covenant do not apply to plans to remodel an existing residence.

This more limited reading of "structures" in paragraph 11 is supported by the rule of construction known by its Latin name *noscitur a sociis*:  "Under the rule of *noscitur a sociis*, "'the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used.'"" (*Dyna-Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1391, fn. 14.)  In accordance with this principle, "a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012; see *In re J.G.* (2019) 6 Cal.5th 867, 880; *Grafton Partners v.*

27

*Superior Court* (2005) 36 Cal.4th 944, 960.) Although in other contexts the word "structure" may include the residence itself, given the apparent object of paragraph 11 and the items listed—restricting the height of fences, hedges, trees, shrubs and other types of landscaping—"structures" in this paragraph is properly limited to outbuildings or similar objects surrounding the dwelling house, rather than improvements to the residence itself.

Additionally, any interpretation of the scope of paragraph 11's restrictions on "structures" must necessarily be influenced by the paragraph's relationship to the document as a whole. (See *Ezer v. Fuchsloch*, *supra*, 99 Cal.App.3d at pp. 861-862 [disapproving "disjointed, single-paragraph, strict construction approach to a restrictive-covenant-document interpretation" and holding CC&R's must be construed as a whole to give effect to every paragraph and to the general intent of the covenanting parties].) Alterations to an existing residence are expressly regulated by paragraph 2. If the architectural committee, empowered by that provision to approve plans for remodeling a residence, were obligated to reject a proposal that obstructed the view from another lot, surely that restriction would also have been included in paragraph 2 or an immediately succeeding provision of the CC&R's.[15]

A similar question of the relationship of a paragraph in the CC&R's that governed construction, erection or alteration of a

---

[15] The *Zabrucky* majority gave a nod toward this reasoning, conceding "it would have been preferable for the drafters of paragraph 11 to have located the prohibition against erection of 'any structure' that obstructs the view of an adjoining homeowner in its own paragraph or subparagraph." (*Zabrucky*, *supra*, 129 Cal.App.4th at p. 628.)

"building, structure or improvement" (paragraph III), and thus unambiguously applied to the residence, and a separate paragraph that prohibited planting or erecting any "hedge or hedgerow, or wall or fence or other structure . . . in such location or in such height as to unreasonably obstruct the view from any other lot" (paragraph IV) was at issue in *White*, *supra*, 116 Cal.App.3d at page 895. In holding that a new single-family residence that satisfied the requirements of paragraph III was not a "structure" subject to paragraph IV, the *White* court emphasized that "the interpretation of paragraph IV was made with reference to the CC & Rs as a whole, and specifically in conjunction with paragraph III" and explained that paragraph III had detailed provisions applicable to the construction of the residence. (*Id.* at pp. 898-899.) Given that organization of the CC&R's, the court concluded, "It is not logical to further restrict buildings by the catchall phrase 'other structures' in a paragraph devoted to hedges, walls and fences." (*Id.* at p. 898.) It is equally illogical here to read paragraph 11, which immediately follows a paragraph prohibiting raising poultry on a Marquez Knolls lot, as containing a significant limitation on a homeowner's ability to remodel and improve his or her home, a topic dealt with extensively in paragraph 2.[16]

---

[16] The incongruity of reading paragraph 11 to apply to renovations to a homeowner's residence was implicitly recognized by the *Zabrucky* majority when it softened that provision's absolute prohibition of any obstruction of a neighbor's view by structures within its ambit to preclude only "unreasonable obstructions" of view, notwithstanding the general principle that "implied terms should never be read to vary express terms." (*Carma Developers (Cal.), Inc. v. Marathon Development*

29

The original 1957 CC&R's for Marquez Knoll tract 20179 and the subsequent amendment to paragraph 12, submitted by the Eisens as interpretative aids, do not suggest a different result.  Originally paragraph 12 read, "No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line."  That paragraph was amended eight weeks later to read, "No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line nor shall any tree, shrub, or other landscaping be planted or constructed that may at present or in the future obstruct the view from any other lot in this tract."  The Eisens point out that the language "or other landscaping be planted or constructed that may . . ." in the amended tract 20179 CC&R's was modified by 1962 in paragraph 11 of the tract 20305 CC&R's at issue in this case to read, "or other landscaping be planted or any structures erected that may . . . ."[17]  This evolution of the wording in the paragraph, they assert, makes it clear that the term "structures" in paragraph 11 "is intended to be different from landscaping and plantings" and "stood separately from the references to tree, shrub, or other landscaping."  True as that may be, nothing in this language change indicates "structures" as used in paragraph 11 was intended to apply to the homeowner's

---

*California, Inc.* (1992) 2 Cal.4th 342, 374; accord, *21st Century Ins. Co. v. Superior Court* (2009) 47 Cal.4th 511, 527.)

[17]     The Eisens explain they did not present this history of the change in language to the trial court because they and the Tavangarians had agreed the *Zabrucky* majority's interpretation of paragraph 11 controlled the court's decision.

residence, rather than to include all forms of outbuildings other than a private three-car garage.

    4. *The Portion of the Judgment Requiring the Street-facing Hedges To Be Trimmed to a Height of Three Feet or Under Is Affirmed*

The Tavangarians neither dispute that paragraph 11 limits to a height of three feet any hedges growing between the street and the front setback line of properties in tract 20305 nor contend the new hedges they installed at 1134 Lachman Lane do not violate that restriction. Instead, they argued in the trial court the Eisens had waived or were estopped from enforcing this provision because the hedges had in the past, even prior to the Tavangarians' purchase of the property, been permitted to exceed three feet and even to grow above the residence's roofline.

In support of their argument the Tavangarians introduced a photograph taken in August 2013 and Google images from 2012 showing the height of hedges above the house's roofline, arguing the Eisens' inaction constituted a waiver. Alternatively, the Tavangarians contend they detrimentally relied on the fact that the hedges had historically exceeded three feet when they replaced the existing hedges with new ones.

Mr. Eisen, on the other hand, testified he could see over the hedges (that is, they had not grown past the roofline) when he and his wife purchased their home in 2009. He also testified that, before the Tavangarians purchased their home in October 2012, the hedges had been trimmed periodically, so they did not grow as high as those in a photograph depicting the new hedges planted by the Tavangarians, and did not block the Eisens' view.

31

The party seeking to establish an affirmative defense of waiver or estoppel bears the burden of proof. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33-34.) Because the trial court found Mr. Eisen's testimony credible, we cannot say the Tavangarians' uncontradicted and unimpeached evidence compelled a finding in their favor on this issue. (See *In re R.V.* (2015) 61 Cal.4th 181, 201 [where a trial court has determined a party has failed to meet its burden on an issue, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the . . . court could not reasonably reject it"]; *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 ["[o]n appeal from a determination of failure of proof at trial, the question for the reviewing court is "'whether the evidence compels a finding in favor of the appellant as a matter of law"'"]; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 [same].) Accordingly, that portion of the judgment and injunction ordering the hedges between the street and the front setback line to be trimmed and maintained at a height of no more than three feet is affirmed.

To be sure, as the Tavangarians argue, and the trial court observed, hedges at roof height could not obstruct the Eisens' view and would likely enhance, rather than detract from, the overall appearance of the remodeled residence at 1134 Lachman Lane. Nonetheless, for whatever reason, the Eisens have insisted on strict compliance with paragraph 11 of the CC&R's, which sets an absolute height limit for hedges. They are entitled to do so.

5. *The Interim Damage Award Must Be Redetermined*

Based on the testimony of the Eisens' appraisal expert, Kenneth Kirschner, the trial court awarded the Eisens $39,000 for the reduction in the monthly rental value of their own home between September 13, 2013 (the date the Eisens filed their lawsuit) and February 23, 2016 (the last day of trial) "caused by Defendants' structures and hedges, which unreasonably obstructed and or unreasonably detracted from Plaintiffs' view." Neither Kirschner nor the trial court attempted to apportion the impact on monthly rental value caused by the various sources of view blockage (that is, to allocate damages among the first-story improvements, second-story renovations and overgrown hedges). Because only the challenge to the height of the front hedges at 1134 Lachman Lane is actionable, if on remand the Eisens still seek damages for any loss of view caused by that violation of paragraph 11, the court must hold a new trial limited to damages resulting from that claim. (See, e.g., *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1052 [remanding case for new trial on compensatory damages limited to plaintiff's cognizable claims].)

## DISPOSITION

The judgment and injunction after bench trial is reversed except as to the order requiring hedges located between the street and the front setback line of 1134 Lachman Lane to be trimmed and maintained at a height of three feet or under. The case is remanded with directions to the trial court to conduct a new trial on damages, consistent with this opinion, and thereafter to enter a new judgment finding in favor of the Tavangarians and 619 Properties on all claims for damages and injunctive relief except with respect to their failure to trim and maintain those

33

hedges as required by the CC&R's.  The parties are to bear their own costs on appeal.


                                        PERLUSS, P. J.

    We concur:



        ZELON, J.



        FEUER, J.